[No. S046176. Aug. 18, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
GLEN CORNWELL, Defendant and Appellant.

**COUNSEL**

Robert Derham, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Ward A. Campbell, Jean M. Marinovich and Tami M. Warwick, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, C. J.**—Defendant Glen Cornwell was charged in the Sacramento County Superior Court with first degree murder (Pen. Code, § 187)[1] for the June 1, 1993 slaying of William Reagan. Defendant also was charged with robbery (§ 211) and, in connection with both offenses, it was alleged defendant personally used a firearm and that the offenses were serious felonies. (§§ 12022.5, subd. (a), 1192.7, subd. (c)(1).) Defendant additionally was charged with unlawful possession of a firearm. (§ 12021, subd. (a).) A robbery-murder special circumstance was alleged (§ 190.2, subd. (a)(17)(A).) It also was alleged that defendant had suffered a prior serious felony conviction and had served a separate prison term for robbery. (§§ 667, subd. (a), 667.5, subd. (b), 1192.7.)

Defendant's first trial ended in a mistrial when the jury was unable to reach a verdict at the conclusion of the guilt phase of the trial. A second jury was empanelled and returned a guilty verdict on the murder and robbery charges; the robbery-murder special-circumstance allegation and firearm-use allegations were found to be true. After defendant waived jury trial, the court found

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

defendant guilty of unlawful possession of a firearm and found true the prior conviction and prior-prison-term allegations. At the conclusion of the penalty phase of the trial, the jury returned a verdict of death. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety for the reasons set forth below.

## I. FACTS

### A. *Guilt Phase Evidence*

The principal participants in the narrative of defendant's crime are defendant; his girlfriend, Juanita Washington; his friend, Roland Johnson; his acquaintance, security guard Michael Johnson (no relative of Roland's); Kimberly Scott, owner of Cashland, a check-cashing business in Sacramento; and William Reagan, the victim, who assisted Kimberly Scott in her business and also was romantically involved with her. Several identification witnesses testified, and other witnesses testified on various points. The principal defense witnesses testified concerning the issue of identification, including possible deficiencies in the eyewitness identification evidence proffered by the prosecution. One witness provided defendant with an alibi.

The setting of the crime was the sidewalk in front of Cashland. The business was located on 16th Street between F and G Streets in Sacramento. There was an alley next to the business, and beyond the alley was an empty lot that served as a parking lot. Also nearby, in the general vicinity, was a supermarket located at 23d and F Streets.

The crime was committed at approximately 1:30 p.m. on June 1, 1993. The evidence against defendant, however, reflected preparatory activity on his part beginning on the previous day, May 31, 1993, when he borrowed an automobile, a brown Toyota, belonging to Juanita Washington, his girlfriend. Defendant drove this automobile to the home of his friend, Roland Johnson, a drug dealer. Defendant asked Johnson for the loan of a handgun, explaining he needed the weapon "to try to make a move on something," and that he had "eyes,"—statements Johnson interpreted as an announcement that defendant planned a robbery and that he had an accomplice who was an insider at the scene of the robbery. Roland Johnson supplied defendant with a loaded .357 magnum revolver and observed defendant drive away in Washington's Toyota.

According to Washington, defendant departed for work at 7:00 a.m. on June 1, 1993, driving her Toyota. Washington's vehicle was parked on the 600 block of 17th Street on that date and was ticketed by a city parking

enforcement officer at that location at 3:52 p.m., the ticket noting that the vehicle's tires had been marked at approximately 1:00 p.m. on that date and that the vehicle had exceeded a two-hour parking limit.

William Reagan generally assisted at Cashland by delivering checks to the business's bank and returning with cash. He performed this task successfully on the morning of June 1, 1993, but his second run of the day ended in his death. He departed from Cashland at 12:30 p.m. and withdrew $9,500 in cash from the bank at approximately 1:00 p.m. The withdrawal consisted of $4,000 in $100 bills, $1,500 in $50 bills, and $4,000 in $20 bills. He was killed on his return as he walked from his automobile, which was parked behind Cashland, through the alley to the front of the establishment. It was noted at the trial that the first day of the month ordinarily was a busy one for Cashland.

The prosecution theorized that the insider whom defendant mentioned to Roland Johnson was Michael Johnson, a man with whom defendant was acquainted and who was employed as a uniformed security guard at Cashland. Michael Johnson generally worked only on the first day of the month and occasionally accompanied other employees on their bank runs. Usually he was armed, but on the day of the crime he was not. During Reagan's second bank run on June 1, 1993, Michael Johnson remained at Cashland and was observed pacing back and forth and looking out the front windows of the business.

At approximately 1:30 p.m. on June 1, 1993, Reagan was walking from the alley to the Cashland business carrying his briefcase, his usual means of transporting the business's cash. A man whom five witnesses identified as defendant approached him from behind and attempted to wrest the briefcase from his grasp. (Robert Blair's observations were made from a vantage point across the street from Cashland, Maria Ramos's from the passenger side of an automobile stopped on 16th Street directly in front of Cashland, Frances Rivers's from an automobile idling in the alley adjacent to Cashland and again from the automobile as it crossed the parking lot behind Cashland, Susan Erickson's through a window inside Cashland, and Cassandra Henderson's from directly in front of Cashland.) When Reagan resisted, defendant produced a weapon and ordered him to drop the briefcase. When Reagan did not comply, defendant fired the weapon. Reagan fell to the ground, the briefcase still in his grasp. Defendant fired a second time, striking Reagan's neck, took the briefcase, and ran down the alley next to Cashland, waving the revolver over his head as if signaling. Defendant ran to the rear of Cashland and into the empty lot behind it. Frances Rivers, one of the persons who observed the shooting, drove away from Cashland after the incident and

circled back through the lot. There she came face-to-face with defendant, whom she recognized as the shooter, and witnessed him run away, accompanied by another man.

Witnesses who were inside Cashland at the time heard someone yell, "they're fighting," then heard gunfire, and crouched on the floor. Scott, the owner of Cashland, heard someone yell, "it's Bill." She ran outside and found Reagan lying on his back on the sidewalk, bleeding from his neck. She could see that he was dying. He was killed by a gunshot wound to his neck that was consistent with impact by a bullet fired from a .357 magnum positioned against his neck. His face and his left hand displayed gunpowder stippling such as would be present if a firearm had been fired at him at short range, but missed. At the scene of the crime, police investigators discovered a bullet and a bullet casing from a .357 magnum revolver.

There was evidence defendant was at a supermarket located a few blocks from Cashland at 23d and F Streets at 2:15 p.m. on June 1, 1993. A police search of defendant's bedroom produced a receipt from the supermarket bearing this date and time. Sometime between 2:30 and 3:00 p.m. on the day of the crimes, defendant arrived at an auto dismantling business and purchased a used white Camaro, paying for the automobile, which cost $1,400, with $20 bills. The purchase was finalized at 3:39 p.m. Defendant was accompanied by another man who was not identified, but who may have been an accomplice.

Between 3:30 and 4:00 p.m. on June 1, 1993, defendant arrived in the Camaro at Roland Johnson's home. According to Johnson, defendant appeared frightened and agitated. He stated he had used Johnson's weapon but could not return it because he no longer possessed it. Defendant paid Johnson $500 in $20 bills for the firearm and for other favors. Defendant reported he had committed a robbery and had been forced to "smoke" the victim. Johnson gave this testimony after receiving certain benefits from law enforcement authorities related to his August 1993 imprisonment for a parole violation. Johnson claimed he began to suffer from a guilty conscience concerning the murder defendant had committed and feared the consequences of his own part in lending defendant the murder weapon. Johnson contacted law enforcement authorities and supplied them with the foregoing information and, in return for testifying, he received an eight-month reduction of his term of imprisonment for the parole violation as well as immunity from prosecution for any act connected with the charged crimes.

Juanita Washington testified concerning events that took place later on the day of the fatal shooting, June 1, 1993. She reported that defendant returned to their home at 5:15 p.m. rather than at his usual hour of 4:00 p.m. He

arrived in a white Camaro she had not seen previously, explaining that his supervisor at work had purchased the automobile for him and that defendant would make periodic payments. Washington was concerned because of "the money situation that we were in." Washington observed a briefcase in the trunk of the Camaro. Defendant informed her he had left her Toyota downtown because he had worked in the neighborhood that day. He drove her to the vehicle's location on the 600 block of 17th Street, where, as noted previously, it had been ticketed.

Defendant's supervisor at his place of employment testified, denying having purchased the Camaro. Another employee, a record keeper, added that defendant failed to report for work on June 1, 1993. Defendant, although he was employed at the time of the crime, had $1.20 in his bank account as of May 21, 1993, had passed three checks with insufficient funds in May 1993, and had at least one overdue bill.

The defense presented was one of mistaken identity and alibi. Although, as noted previously, five prosecution witnesses positively had identified defendant as the perpetrator, four other witnesses who stood in front of or near Cashland and witnessed the crime testified at trial that defendant was *not* the shooter. (These defense witnesses included Alicia McKee, who had stood immediately in front of Cashland; her sister, Sharlean McKee, who had stood approximately four feet from the victim as he was shot; Marvin Napoleon, whose observations were made from a position 15 feet from the shooting; and Alice Sanchez, who was standing with Napoleon 15 feet from the shooting.) Two of these witnesses, Alicia and Sharlean McKee, had identified someone other than defendant at a live lineup, whereas two others, Marvin Napoleon and Alice Sanchez, had been unable to make a positive identification at the live lineup. An additional defense witness, Robert Young, a teller at Cashland, had identified someone at the live lineup other than defendant as the perpetrator, but at trial Young testified he was unable to say whether or not defendant was involved.

The prosecution impeached these witnesses to varying degrees. For example, Alicia McKee previously had testified she was not certain whether defendant was the assailant. Sharlean McKee testified the defense investigator had shown her a photograph of defendant and had informed her he was not responsible for the shooting. Marvin Napoleon was a heavy drinker who conceded he had focused on the weapon, not the face of the assailant, during the crime. Alice Sanchez, who also was a heavy drinker, noted the defense investigator had shown her a photograph of defendant, commenting that defendant was innocent.

The defense also introduced evidence establishing that one of the prosecution's identification witnesses, Susan Erickson, was being treated for heroin

addiction, was taking methadone at the time of the crime, and was awaiting trial on a robbery charge at the time of her testimony. In addition, the defense investigator testified that when he showed Erickson a photo lineup that did not include defendant's photograph, she selected someone other than defendant as the shooter. Erickson qualified her identification with the comment that the man in the photograph merely resembled the shooter. The investigator also denied informing identification witnesses that defendant was innocent.

The defense also offered the expert opinion testimony of Dr. Geoffrey Loftus, a professor of psychology and an expert in eyewitness identification. Dr. Loftus explained that human memory does not operate as a mechanical recording device but instead is constructed from various sources, including information learned after an incident. Loftus asserted that stressful events that occur quickly often are not recalled accurately, especially after the passage of considerable time. He discussed the impact of race on eyewitness identification[2] and further explained that a weapon generally becomes the focus of any observation of a crime.

In addition, defendant produced an alibi witness, Billy Mackey, a person with three prior felony convictions, who testified he had spent the day of June 1, 1993, from 8:00 or 8:30 a.m. until after 2:00 p.m. with defendant at the auto dismantling shop where defendant acquired the Camaro, at a restaurant, and at the witness's home. According to Mackey, defendant did not have an automobile in his possession during this period. Mackey did not testify at defendant's first trial, although he was aware of the legal proceedings, but came forward two weeks prior to the retrial.

Michael Johnson, the Cashland security guard, testified that he was barely acquainted with defendant and was not involved in any plan to rob Reagan.

B. *Penalty Phase Evidence*

By stipulation, the prosecution presented evidence that in February 1985, defendant was convicted of eight robberies. These eight offenses occurred as separate incidents during a four-month period in 1983. On each occasion, defendant robbed an employee of a commercial establishment at gunpoint. There were no injuries, although in some instances defendant either displayed

---

[2] The court placed on the record its observations concerning the ethnic identity of certain witnesses, stating that prosecution witnesses Blair, Ramos, and Erickson were White and that prosecution witnesses Rivers and Henderson were African-American. The court stated that defense witnesses Johnson and Young were African-American, that defense witnesses Sanchez and Napoleon were either Native American or Hispanic, and that defense witnesses Alison and Sharlean McKee were White. The record also reflects that defendant is African-American and that the murder victim, William Reagan, was White.

a firearm or threatened the victims with a firearm. Defendant was sentenced to prison for these crimes and was released on parole on September 24, 1992, less than a year preceding the murder in the present case. It was stipulated that defendant's convictions rendered it illegal for him to be in possession of a firearm at the time of the murder.

The sole witness to testify for the prosecution at the penalty phase was Robin Reagan, one of the murder victim's five children. She offered brief testimony describing the victim's admirable qualities, the shock she had suffered at the moment she learned of his death, and the sad impact of his absence on his children and grandchildren.

Defendant testified in his own behalf at the penalty phase. He explained that his father had left the family when defendant was six years of age. Defendant described a generally happy childhood in a close-knit family. In June 1973, defendant joined the Unites States Navy. He did not see combat during his service, but traveled extensively. After three years of active service, defendant served in a Navy Reserve unit. Upon his honorable discharge in 1979, he was able to find civil service employment, although he did not stay long at various positions. During his reserve service and extending until 1981, defendant suffered from depression. During his employment with the United States Postal Service, defendant suffered a mental heath crisis. He was diagnosed as suffering from bipolar disorder and was hospitalized on more than one occasion. Defendant testified that various medications, including lithium, Haldol, Prolixin, and Thorazine were prescribed for him.

According to defendant, he suffered continuing stress from his employment, his difficult romantic relationship, and the absence of his family. He conceded that he "probably" committed the eight robberies referred to in the stipulation. He acknowledged his conduct had been "terrible, terrible." He declared he had not been motivated by the need for money but by his enjoyment of the role of an outlaw, asserting he had given away some of the proceeds of the eight robberies. He stated he was not taking his prescribed medication at the time of the robberies. Defendant testified he worked while imprisoned for the robbery convictions and also when he was on parole. In June 1993, he had temporary employment as a clerical worker, was employed by a company called Bell Carter Distributing, and also refurbished and sold used motorcycles. Defendant did not believe he was suffering from a mental disease at the time of the murder, and did not want to take the psychotropic medication prescribed for him because of its negative side effects, including mental confusion. Defendant testified he had no current relationship with the members of his family, including his daughter, who was then 20 years of age.

On cross-examination, defendant stated that his recollection of the eight stipulated robberies was impaired. He testified he had been accused of 40

robberies, was tried for 16 of them, and convicted of eight. He also conceded that he recalled that—at a minimum—he at least had displayed a firearm during each of the eight robberies and, by implication, having threatened his robbery victims with death in the event they failed to comply with his demands.

Defendant married Carolyn Cornwell on June 3, 1993 (two days after Reagan was murdered). She testified that she and defendant had a happy relationship and that he worked full time five or six days a week.

Deputy Sheriff Raymond Roberts testified that defendant had served as a trusty during his incarceration pending trial and had performed diligently.

Crendell Polee, Jr., defendant's older brother, testified that defendant had been a studious, athletic youth and never was in trouble as a child. He testified that schizophrenia is "quite common" in the family, that (in his opinion) defendant had exhibited signs of the disease, and that, when Polee last had seen defendant in 1982, defendant exhibited signs of stress and communicated in a rapid, stuttery form of speech.

James Esten, formerly an administrative employee for the California Department of Corrections, described the various levels of confinement within the prison system, the unlikelihood that a prisoner serving a sentence of life without possibility of parole would be housed in any but the most restrictive custody (which Esten described), and the circumstance that such prisoners never can be and never have been paroled. When defendant arrived at the prison, he had been taking lithium, Mellaril, and Elavil, and Esten explained that during defendant's incarceration for robbery, his behavior was good and he was a valuable worker. Eston predicted that defendant would make an excellent prisoner, could assist correctional officers in pacifying other inmates, and again would be a valuable worker.

Dr. Shawn Johnston, a clinical psychologist, reviewed defendant's medical records and also met with defendant in order to perform a psychological evaluation. Dr. Johnston concluded that defendant suffered from a bipolar disorder, as defendant had since the late 1970's. Dr. Johnston noted that defendant had been prescribed medication for this condition on a number of occasions.

Dr. Johnston testified that defendant's record demonstrated that he had exhibited periods of agitation, pressured speech, "flights of ideas," and paranoid delusions—symptoms that are characteristic of bipolar disorder. Dr. Johnston described the manic phase of the disease, noting that afflicted persons feel wonderful, enjoying superabundant energy. At the same time,

persons in the manic phase of the disease engage in reckless behavior and suffer from memory disorders. Psychological tests performed by Dr. Johnston on defendant disclosed likely learning disability, psychoneurological deficits or brain damage, confused thinking, agitation, and indications of mania and schizophrenia.

Dr. Johnston explained that bipolar disorder impairs the subject's judgment and, during extreme manic phases, may deprive the subject of the ability to know right from wrong. On cross-examination he conceded that a person diagnosed with bipolar disorder ordinarily is able to distinguish right from wrong. Dr. Johnston also noted that on the Minnesota Multiphasic Personality Inventory, defendant scored in the third highest range in psychopathic deviance, a score outside the normal range, but the witness predicted that defendant would function well in a highly structured environment such as prison.

## II. GUILT PHASE CLAIMS

### A. Wheeler *Motion*

Defendant, who is African-American, contends the prosecutor exercised a peremptory challenge against Juror T., who also is African-American, because of her race, in violation of the federal constitutional guaranty of equal protection of the laws (*Batson v. Kentucky* (1986) 476 U.S. 79, 84 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*)) and the state constitutional right to a jury drawn from a representative cross-section of the community. (See *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).)[3]

■ " 'Exercising peremptory challenges because of group bias rather than for reasons specific to the challenged prospective juror violates both the California Constitution and the United States Constitution. [Citations.]' " (*People v. Cleveland* (2004) 32 Cal.4th 704, 732 [11 Cal.Rptr.3d 236, 86 P.3d 302].) In a recent decision, the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral

---

[3] At trial, defense counsel referred only to *Wheeler*, *supra*, 22 Cal.3d 258. We permit defendant to raise his *Batson* claim for the first time on appeal, because the claims are so closely related. (*People v. Young* (2005) 34 Cal.4th 1149, 1174 [24 Cal.Rptr.3d 112, 105 P.3d 487].)

justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 138, 125 S.Ct. 2410, 2416], fn. omitted (*Johnson*).)

■ The court went on to explain that "a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson, supra,* 545 U.S. at p. 170 [162 L.Ed.2d at p. 139].) The defendant having shown membership in a cognizable class, and keeping in mind " 'that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate," ' " the defendant " 'must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.' " (*Ibid.*)

■ In the present case, as we shall explain, our scrutiny of the record causes us to believe that defendant failed to meet the standard imposed by *Batson, supra,* 476 U.S. 79, and *Johnson, supra,* 545 U.S. 162 [162 L.Ed.2d 129]. We note that because we reach this conclusion, we are not obliged to consider the persuasiveness of the prosecutor's justifications. (*People v. Young, supra,* 34 Cal.4th at p. 1173; *People v. Farnam* (2002) 28 Cal.4th 107, 135 [121 Cal.Rptr.2d 106, 47 P.3d 988]; see also *Johnson, supra,* 545 U.S. at p. 171 [162 L.Ed.2d at p. 140] [" 'It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination' "].)

Only two African-American persons were included in a venire of 117 persons. The prosecutor exercised a peremptory challenge against one of them, Juror T.; the prosecutor repeatedly passed the other African-American prospective juror, and the individual served on the jury. In her juror questionnaire, Juror T. noted that she had relatives and several close friends who had worked in law enforcement, commented that the criminal justice system seemed to involve more spectacle than substance, that in that system, process is exalted above truth, and that "[t]he law seems to exist to perpetuate its system rather than do justice. Minorities are not treated the same as whites." She added that several of her close relatives had been arrested and that her aunt served a prison sentence for homicide. The juror stated that "nearly all" of her close relatives have been subjected to "burglaries, robberies, car theft or break ins" and that she had suffered a burglary and an auto theft. She expressed the view that the criminal justice system sometimes treats citizens unfairly because of race, offering an example: "The first Rodney King trial

where the officers were acquitted seemed to be a blatant miscarriage of justice, because the victim . . . was black." She wrote that "Blacks, poor people, minorit[ies and] women seem to get harsher treatment than whites, rich people. I've known many studies & research to show this as fact." On the other hand, she appeared to favor use of the death penalty and consistently acknowledged a juror's duty to consider the evidence fairly and to follow the law as directed by the court.

It was the trial court, not counsel, who conducted the individual voir dire. During voir dire, the same juror noted that her brother-in-law was a superior court judge in Los Angeles, that other family members or friends were lawyers or were involved in law enforcement, and that she had received some instruction on the basics of criminal law and criminal procedure in connection with her employment. She explained that she believed that the aunt who had served a prison term for homicide had been wrongly convicted.

The court, having posed several questions concerning her aunt's conviction, asked: "Has that left you with any feelings about the criminal justice system, especially in murder cases, that you feel that you've developed any negative feelings about the system because of that case?" The juror responded: "No, not about the system. It's just that things aren't always the way they seem."

Voir dire continued the following morning. The court posed additional questions to Juror T., commenting that in her questionnaire "[i]n terms of the justice system treating people unfairly you said that yes, sometimes you feel it does, and as an example apparently you wrote in the first Rodney King trial. What do you mean by the injustice that you perceive there?"

The juror responded: "Well, it seemed that even with the major evidence, that having it on videotape there was still some lack of believing that police could treat a black man like that. And then when the trial took place, the first trial they were acquitted, even though almost the whole world saw it happening. And coming from Los Angeles and having had relatives treated like that myself it just—it makes it very very hard to keep trusting."

The juror also felt law enforcement officers were too "casual" in investigating the crimes committed against her and her family. Her questionnaire and voir dire disclosed that she believed the criminal justice system was too cumbersome and proceeded far too slowly. She consistently assured the court, however, that she would put aside her personal views in evaluating the evidence and the potential penalty.

When the prosecutor excused Juror T., defendant objected. Defense counsel offered to submit the matter without argument, but the court requested that

counsel attempt to establish a prima facie case that the juror was excused because of bias against African-American persons, asking defense counsel to give "specific reasons . . . that would tend to indicate that there has been an invidious discrimination in the selection of jurors." Defense counsel responded briefly, making only two points. First, he noted there were only two African-Americans on the two jury panels in the venire, and that the prosecutor excused one of them, Juror T. Second, defense counsel asserted that neither Juror T.'s questionnaire nor her responses during voir dire indicated she was subject to challenge for cause or "that she couldn't sit as a fair and impartial juror in this matter."

The trial court determined defendant had not made a prima facie showing of group bias. The court noted that Juror T.'s questionnaire, which it had reviewed prior to its voir dire of the juror, caused the court to pose substantially more followup questions in a "much larger number of areas" than had been the case for other jurors. The court complimented the juror for her thoughtful responses but stated that the juror, unlike others, was distinguished by the circumstances that her aunt had been prosecuted for the crime of murder and by the juror's strongly held view that the criminal justice system is not fair when questions of race are presented. Specifically, the court observed, she had lost faith that the criminal justice system operates fairly for African-American persons. "While she did say some of her faith had been restored by the second Rodney King trial, she did indicate some continuing concerns about it, especially as it relates to participants in the trial who are black." The court also noted that although the other African-American juror, who had "been there since the beginning as a second juror," had been passed repeatedly by the prosecutor, the prosecutor challenged Juror T. "the moment she sat down."

Although the court expressly determined that defendant had not made a prima facie showing of group bias and denied the defense motion on that basis, it permitted the prosecutor to comment upon defendant's claim. The prosecutor asserted that defense counsel themselves had exhibited some interest in challenging Juror T. The prosecutor explained that his challenge was motivated, not by group bias, but by the fear that Juror T. might not give the prosecution case against defendant, an African-American, a fair hearing because she believed "blacks were treated unfairly in the system" and "she's had relatives . . . 'treated like Rodney King.' " The prosecutor also alluded to the juror's statement that her aunt had been wrongly convicted of homicide.

■ As noted, in support of his claim in the trial court, defendant alluded to nothing more than the circumstance that (1) one of the two African-Americans among the potential jurors had been challenged, and (2) the juror would not have been subject to excusal for cause. The circumstance that the

prosecutor challenged one out of two African-American prospective jurors does not support an inference of bias, particularly in view of the circumstance that the other African-American juror had been passed repeatedly by the prosecutor from the beginning of voir dire and ultimately served on the jury. (See *People v. Box* (2000) 23 Cal.4th 1153, 1188–1189 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Arias* (1996) 13 Cal.4th 92, 136, fn. 15 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Crittenden* (1994) 9 Cal.4th 83, 119 [36 Cal.Rptr.2d 474, 885 P.2d 887].) The circumstance that the juror was not subject to exclusion for cause certainly did not support an inference that the exercise of a peremptory challenge against her was motivated by group bias. ▪ (See *People v. Turner* (1994) 8 Cal.4th 137, 165 [32 Cal.Rptr.2d 762, 878 P.2d 521], disapproved on another point in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5 [15 Cal.Rptr.3d 743, 93 P.3d 344] [a prosecutor may act on a hunch or apparently arbitrarily, as long as the peremptory challenge is not based on group bias]; *People v. Arias, supra,* 13 Cal.4th at p. 136.)

The juror's own remarks also clearly do not support an inference she was excused because of her race—on the contrary, despite her obvious intelligence and good faith, her voir dire disclosed a large number of reasons other than racial bias for *any* prosecutor to challenge her, including but not limited to her personal experience with an allegedly unfair homicide prosecution of a close relative and her express distrust of the criminal justice system and its treatment of African-American defendants—a view not restricted to African-American persons. (See *People v. Farnam, supra,* 28 Cal.4th at p. 138; *People v. Cleveland, supra,* 32 Cal.4th at p. 733; *People v. Pride* (1992) 3 Cal.4th 195, 230 [10 Cal.Rptr.2d 636, 833 P.2d 643].) Nor do we find anything else in the record to supply a basis for an inference that the prosecutor was motivated by racial prejudice.

Defendant claims the trial court erroneously required him to prove the existence of "systematic discrimination" (that is, proof that minorities are underrepresented in the venire), citing *People v. Arias, supra,* 13 Cal.4th 92. In that case, we commented that "[c]ertain aspects of the trial court's findings were neither necessary nor relevant, since a *Wheeler* violation does not require 'systematic' discrimination [citation], and is not negated simply because both sides have dismissed minority jurors or because the final jury is 'representative.' " (*Id.* at pp. 136–137.) Contrary to defendant's claim, however, the trial court in the present case did not suggest that a prima facie case of group bias could not be established so long as a member of the cognizable group remained on the jury, nor did the court refer to systematic discrimination or to minority jurors struck by the defense.[4]

---

[4] On appeal, defendant for the first time suggests it would be inaccurate to conclude a member of the cognizable group remained on the jury, claiming the relevant group was African-American *women.* We have agreed that such persons constitute a cognizable group

■ Defendant asks us to examine the responses of jurors other than Juror T. in determining whether the trial court erred in finding that defendant failed to establish a prima facie case of group bias. In earlier cases we explained that, although such an examination is appropriate at the trial court level when the issue properly is brought to that court's attention, such an examination for the first time on appeal is unreliable. (See *People v. Box, supra,* 23 Cal.4th at p. 1190; *People v. Ervin* (2000) 22 Cal.4th 48, 76 [91 Cal.Rptr.2d 623, 990 P.2d 506], and cases cited.) Defendant urges reconsideration of these cases in light of the high court's decision in *Johnson, supra,* 545 U.S. 162 [162 L.Ed.2d 129], in which the court did not comment upon whether comparative analysis should be undertaken for the first time on appeal, and another decision issued the same day, *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317], in which the court employed comparative juror analysis in circumstances in which it was undisputed that a prima facie case had been made. Assuming without deciding that a comparative juror analysis should be undertaken under the circumstances presented, we conclude defendant's proffered analysis fails to establish a prima facie case of group bias.

In the present case, defendant did not direct the trial court's attention to voir dire or questionnaire responses of jurors other than Juror T. other than to comment on the thoroughness of Juror T.'s questionnaire and voir dire responses. Assuming without deciding that a comparative analysis is appropriate for the first time on appeal when a reviewing court is engaged in determining whether a prima facie case of group bias was established, we agree with respondent that, contrary to defendant's claims, defendant has not identified prospective jurors of other ethnicities who were not challenged but had a similar background and views, including personal experience with a close relative's assertedly wrongful homicide conviction. We note that two jurors were excused who also had the experience of having close relatives prosecuted for murder (Juror S. and Juror F.), whereas the jurors cited by defendant and not excused experienced the prosecution of relatives for much less serious matters such as driving offenses and, moreover, these jurors did not express the belief that their relatives had been wrongly convicted. (E.g., Juror J. [driving offense], Juror R. [juvenile theft offense], Juror W. [driving offense; this juror also had a relative who had served prison time but she knew nothing else about that matter], Juror O. [a long-deceased relative had been convicted of many theft-related crimes].) Nor did the jurors to whom defendant refers share Juror T.'s marked view that the criminal justice system treats African-American persons unfairly. (Cf. Juror M. [police officers fail to

---

(*People v. Young, supra,* 34 Cal.4th at p. 1173), but the claim was not raised in the trial court and is forfeited. (*People v. Cleveland, supra,* 32 Cal.4th at p. 734.) In any event, the underlying premise that the court assumed no prima facie case had been established as long as one African-American man served on the jury simply is not supported by the record.

handle inebriated persons well], Juror R. [O.J. Simpson was treated differently from the way ordinary citizens would have been treated during the so-called Bronco chase], Juror C. [this juror, examined subsequent to the *Wheeler* motion, commented on the Rodney King trial but related her concerns about racial issues in the criminal justice system to the riots that followed that individual's first trial and the effect of this civil strife upon his second jury, denying the episode caused her to lose faith in the jury system: "I'm not concerned about it being fair, I'm concerned about the riot continuing and the civil disorder and how it may have related to the thinking of the second jury"], Juror O. [suggesting that justice is not always done, because the criminal justice system is overburdened].)

Defendant urges that Juror T. appeared more knowledgeable about legal procedure than jurors who served on the jury, pointing to her statement that 10 years prior to trial, she had received some training in law enforcement issues in connection with her employment in an administrative capacity, whereas other jurors displayed some confusion concerning matters such as delay in prosecution and the right to public trial. We see no reason why Juror T.'s limited training would render her a more desirable juror for the prosecution or that a comparison with the other jurors would support an inference Juror T. was challenged on the basis of racial bias. Defendant also emphasizes Juror T.'s connection to persons involved in law enforcement and the judicial system, including the late Attorney Johnnie Cochran, contending that some other jurors who served actually were less desirable for the prosecution by virtue of their lack of similar relationships. Again, we do not see that the comparison supports an inference that Juror T. was excused because of racial bias. Defendant claims that Juror T. exhibited many views favoring the prosecution's case, including support for the death penalty and the view that there should be more vigorous prosecution of crime. He contends that the unchallenged jurors expressed more equivocal views on such subjects and that some failed to exhibit the enthusiasm for jury service expressed by Juror T. He notes Juror T. repeatedly acknowledged a juror's duty to put aside personal opinions and to follow the law. These circumstances do not signify, however, that the prosecutor was bound to accept her as a juror if reasons apart from group bias supported his challenge, nor, in view of the totality of the evidence, do such circumstances support an inference that the prosecutor challenged Juror T. because of her race.

In supplemental briefing, defendant contends reversal is required on the ground that the trial court determined (or may have determined) whether defendant established a prima facie case by asking whether it was "more likely than not" that the prosecutor challenged Juror T. on the basis of impermissible group bias. As defendant observes, the high court in *Johnson, supra,* 545 U.S. at p. 164 [162 L.Ed.2d at p. 135] expressly disapproved of that standard for purposes of establishing a prima facie case. He points out that

we must presume the trial court followed existing law, and that at the time of trial the court would have relied upon our *Wheeler* decision, which alluded to a "reasonable inference" of group bias as a basis for a prima facie showing and also called for the defendant to establish a "strong likelihood" that a juror has been peremptorily challenged on the basis of group bias. (*Wheeler, supra,* 22 Cal.3d at pp. 280, 281.) Our subsequent decision holding that both of the quoted terms were essentially the same as the *Batson* standard, and that a prima facie showing called for a demonstration that it was "more likely than not" that group bias accounted for the challenge, was disapproved in *Johnson, supra,* 545 U.S. at pp. 164, 167 [162 L.Ed.2d at pp. 135, 137] (reversing *People v. Johnson* (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270]).

We are not persuaded. Regardless of the standard employed by the trial court, and even assuming without deciding that the trial court's decision is not entitled to deference, we have reviewed the record and, like the United States Supreme Court in *Johnson, supra,* 545 U.S. 162 [162 L.Ed.2d 129], are able to apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror on the basis of race. The record does not support such an inference; it is devoid of any suggestion that the basis for the challenge to Juror T. was even "close" or "suspicious." (*Johnson, supra,* 545 U.S. at p. 167 [162 L.Ed.2d at p. 137].)

█ In his supplemental brief, defendant also contends that the trial court's determination was flawed because it speculated as to the prosecutor's reasons for challenging the juror when it referred to the juror's views on the criminal justice system and the circumstance that her aunt had been convicted of murder. He relies again upon the *Johnson* decision, in which the court stated: "The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.] The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question. See *Paulino v. Castro,* 371 F.3d 1083, 1090 ([9th Cir.] 2004) ('[I]t does not matter that the prosecutor might have had good reasons . . . [w]hat matters is the real reason they were stricken' . . . )." (*Johnson, supra,* 545 U.S. at p. 172 [162 L.Ed.2d at pp. 140–141].) The quoted caution against speculation must be read in light of the high court's statement that a prima facie case is established when the "defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Id.* at p. 170 [162 L.Ed.2d at p. 139].) Once the trial court concludes that the defendant has produced evidence raising an inference of discrimination, the court should not speculate as to the prosecutor's reasons—it should inquire of the prosecutor, as the high court directed. But there still is a first step to be taken by the defendant,

namely producing evidence from which the trial court may infer "that discrimination has occurred." (*Ibid.*) We have concluded that the evidence alluded to by defendant in the trial court did not support such an inference, nor was such an inference supported by the challenged juror's own statements or anything else in " 'the totality of the relevant facts' " (*Miller-El v. Dretke, supra*, 545 U.S. at p. 239 [162 L.Ed.2d at p. 213]) that we have seen in our examination of the record (including the statements of other prospective jurors).

### B. *Conflict of Interest*

Defendant contends a potential conflict of interest came to light when, prior to defendant's *first* trial, the prosecutor informed the court that prosecution witness Roland Johnson recognized one of defendant's two defense counsel, Emory King, as the man who had represented Johnson's wife when the couple were prosecuted jointly for drug sales nine years prior to the trial in the present case. The court instituted an inquiry of King and found there was no conflict of interest. Defendant contends the court's failure to conduct a more thorough hearing constituted a violation of his federal constitutional right to the effective assistance of counsel, specifically to counsel free from a conflict of interest. He contends we must reverse the judgment or at least remand for further hearing in the trial court. We are not persuaded.

The trial court questioned the prosecutor and King at a brief hearing, ascertaining the nature of the case in which King had been involved and noting that King had not represented prosecution witness Roland Johnson, but his wife. The court reasoned that the wife's interest must have been adverse to her husband's, judging by the appointment of separate counsel for each defendant. King did not recall having been involved in any previous prosecution of Roland or his wife. The court saw no indication of any potential conflict of interest, adding that King was not responsible for the examination of witnesses during the guilt phase of defendant's trial. The court requested that King check his own records. At a subsequent hearing, the court asked the parties whether there was any further information to be placed on the record and directed "[b]oth sides [to] try to look into that to see if there's any further information to be brought to the [c]ourt's attention." King then agreed that the court was accurate in stating that King had not represented Roland Johnson, but instead his wife. King stated that he still was looking for the relevant case file, but added that he did not believe there was any potential conflict of interest. Prior to the *second* trial, the court expressly found that King and defendant had no conflict of interest. Neither defendant nor defense counsel objected.

The Sixth Amendment right to effective assistance of counsel under the federal Constitution includes the right to representation free from any

conflict of interest that impairs counsel's efforts on behalf of his or her client. (*Mickens v. Taylor* (2002) 535 U.S. 162, 166, 171 [152 L.Ed.2d 291, 122 S.Ct. 1237]; see *Wood v. Georgia* (1981) 450 U.S. 261, 271 [67 L.Ed.2d 220, 101 S.Ct. 1097]; *People v. Hardy* (1992) 2 Cal.4th 86, 135 [5 Cal.Rptr.2d 796, 825 P.2d 781].) We have recognized that counsel's current or prior representation of a witness may create a conflict, because counsel bears professional responsibilities both to the witness and to the client and may have confidential information concerning his or her representation of the witness. (*People v. Cox* (2003) 30 Cal.4th 916, 949 [135 Cal.Rptr.2d 272, 70 P.3d 277]; *People v. Bonin* (1989) 47 Cal.3d 808, 835 [254 Cal.Rptr. 298, 765 P.2d 460].) But when the attorney has not received any pertinent confidential information from the witness, ordinarily there is no actual or potential conflict of interest. (*People v. Cox, supra*, 30 Cal.4th at p. 949.)

█ Under the federal Constitution, a defendant who did not object to an asserted conflict at trial must demonstrate on appeal that there was an actual conflict of interest that "adversely affected [the] lawyer's performance." (*Cuyler v. Sullivan* (1980) 446 U.S. 335, 348 [64 L.Ed.2d 333, 100 S.Ct. 1708].) In some circumstances, the defendant in such a situation is not obliged to establish that the conflict and its adverse effect on counsel's representation was prejudicial—that is, that it is reasonably probable, in the absence of the conflict and its effect on counsel's performance, that the outcome of the trial would have been different. Reversal is required simply on a showing of actual conflict that adversely affected counsel's representation. (*Mickens v. Taylor, supra*, 535 U.S. at pp. 166, 172–175 [assuming, without deciding, that lower courts correctly have extended this rule beyond an attorney's concurrent representation of multiple defendants]; see also *People v. Cox, supra*, 30 Cal.4th at p. 948.)

█ When a court " 'knows or reasonably should know that a particular conflict exists,' " it should inquire into the conflict even in the absence of objection by the defendant or his or her counsel. (*Mickens v. Taylor, supra*, 535 U.S. at p. 168; see *Cuyler v. Sullivan, supra*, 446 U.S. at p. 347; *People v. Bonin, supra*, 47 Cal.3d at p. 836.) Under the federal Constitution, the duty to inquire is not triggered merely because of "a vague, unspecified possibility of conflict." (*Mickens v. Taylor, supra*, 535 U.S. at p. 169.) Although the trial court is required to perform some inquiry once it knows or reasonably should know of a particular conflict of interest, the court may decline to pursue the matter if, in its view, the potential for conflict is too slight. (See *People v. Bonin, supra*, 47 Cal.3d at p. 837.) In *Cuyler v. Sullivan, supra*, 446 U.S. 335, for example, although the high court recognized the trial court's duty to inquire into potential conflicts, the circumstance that defense counsel represented three defendants charged and tried separately for murder did not trigger a duty to inquire in the absence of any objection from a defendant. The separate prosecutions mitigated the potential for conflicting defenses, the

defenses were consistent, and there was no indication counsel provided less than a vigorous defense. (*Id.* at pp. 346–347; see also *Mickens v. Taylor, supra,* 535 U.S. at pp. 168–169.) The trial court may place substantial weight on counsel's assertion that no conflict of interest exists. (*People v. Lawley* (2002) 27 Cal.4th 102, 146 [115 Cal.Rptr.2d 614, 38 P.3d 461].)

As noted, neither defendant nor his counsel objected to King's continued representation at the first or second trial. Indeed, King stated he believed there was no potential for a conflict. The circumstance that many years prior to the first trial in the present case one of defendant's attorneys had taken responsibility for the defense of a person who was not a witness in the present case and whose interest was adverse to that of a prosecution witness does not suggest that defense counsel's loyalty to defendant was impaired in any manner. Defendant speculates that Johnson's wife *might* have related to King some statement by her husband that *might* have been useful to the defense. Defendant urges that defense counsel would be obliged to treat such a statement as a privileged communication between spouses. There was no indication, however, that King had received any confidential information that would relate to the present case. There is no basis even for informed speculation that such a communication, had it occurred, had any bearing on the present unrelated case many years later. We believe that the potential conflict identified by defendant in this appeal was so remote and tenuous that it did not require the trial court to inquire further than it did.

██ Even if we were to conclude that the court should have conducted further inquiry, any error would not require reversal. This court repeatedly has concluded that "[a] conviction will be reversed on the ground the trial court failed to satisfy its duty to inquire into a possible conflict, or to adequately respond to its inquiry, only where the defendant demonstrates that an actual conflict of interest existed, *and that the conflict adversely affected counsel's performance.*" (*People v. Frye* (1998) 18 Cal.4th 894, 999 [77 Cal.Rptr.2d 25, 959 P.2d 183], and cases cited, italics added.)

Defendant does not attempt to demonstrate how the alleged conflict affected King's performance. As noted, there is no evidence defense counsel actually possessed confidential information arising from his prior representation; indeed, defense counsel agreed with the court that there was no potential for conflict. As the trial court observed, King was not responsible for examining Johnson. (See *People v. Clark* (1993) 5 Cal.4th 950, 1002 [22 Cal.Rptr.2d 689, 857 P.2d 1099] [noting a similar circumstance].) Defendant offers no basis for concluding that the performance of either of his attorneys was adversely affected by King's prior contact with Roland Johnson's wife.

Defendant contends he should not be required to establish that the asserted conflict had an impact on his attorney's performance. He claims that the

standard of review we have applied in our prior cases—namely, that failure to conduct an adequate inquiry does not require reversal of the conviction unless the defendant can establish actual conflict, including an adverse impact on counsel's performance—is contrary to the high court's approach and analysis in *Wood v. Georgia, supra,* 450 U.S. 261. In *Wood,* the trial court failed to conduct an inquiry although it was on notice that the defendants, former employees charged with failure to pay a fine imposed as a condition of probation, were represented by counsel retained by their employer, whose interest diverged from theirs. The employees' defense was that (1) imposition of the fine violated equal protection principles because the employees would be incarcerated on the basis of their inability to pay, and (2) they had believed their employer would pay the fine. The interests of the former employees and the employer were in potential conflict, because it was in the employer's interest to avoid its obligation to pay the fines by permitting heavy fines to be levied against its employees and then to raise the equal protection defense on their behalf. (*Id.* at pp. 264, 267.) The employer's counsel "may not have pursued [the employees'] interests single-mindedly," as the trial court should have recognized. (*Id.* at pp. 271–272.) The high court vacated the judgment and remanded the case to the trial court to determine whether an actual conflict existed, without clearly referring to any adverse effect on counsel's performance.

But the high court in the *Mickens* case specifically rejected the view that the *Wood* decision stands for the proposition that a trial court's failure to perform an adequate inquiry into a potential conflict requires reversal in the absence of a showing of an adverse effect on counsel's performance. In *Mickens,* in which it also was alleged that the trial court had conducted an inadequate inquiry, the high court explained that prior cases held that failure to conduct an adequate inquiry required reversal when the defendant demonstrated an "actual conflict." An actual conflict and an adverse effect on counsel's performance are not separate considerations, however. Rather, an *actual* conflict is demonstrated precisely when it can be established that a conflict of interest "adversely affected counsel's performance." (*Mickens v. Taylor, supra,* 535 U.S. at p. 171.)

In *Mickens,* the court explained that its conflict of interest doctrine is a product of its enforcement of the Sixth Amendment right to effective assistance of counsel. (*Mickens v. Taylor, supra,* 535 U.S. at p. 166.) Denial of that right ordinarily does not require reversal of a conviction in the absence of a showing that it is reasonably probable the attorney's ineffective representation affected the outcome. (*Ibid.,* citing *Strickland v. Washington* (1984) 466 U.S. 668, 685–686, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052].) Exceptions to the *Strickland* prejudice standard arise when a defendant has been denied the assistance of counsel entirely, or has been denied the assistance of counsel at a critical stage or in other " 'circumstances of that

magnitude.' " (*Mickens v. Taylor, supra,* 535 U.S. at p. 166.) An attorney who actively represents conflicting interests may create a situation " 'of that magnitude' " (*ibid.*), but only after it is established that the conflict of interest actually affected counsel's representation. A trial court's duty to inquire into a potential conflict does not involve a problem of the same magnitude. When a defendant claims that a trial court's inquiry into a potential conflict was inadequate, the defendant still must demonstrate the impact of the conflict on counsel's performance. (*Id.*, at pp. 173–174.)

Further, contrary to defendant's suggestion, the *Wood* decision certainly did not conclude that due process or Sixth Amendment principles require, if not an outright reversal, an automatic remand for further hearing whenever a trial court has not inquired sufficiently into a potential conflict of interest. Rather, the high court relied upon a record demonstrating an obvious potential conflict of interest that seriously implicated the employees' counsel's decision to pursue a theory of the case that benefited the employer rather than the employees. The case before us does not present such a record.

Accordingly, even if the trial court should have inquired further, we reject defendant's argument in light of the record as a whole and the absence of any evidence—or even a claim—that a conflict of interest affected defense counsel's performance.

### C. *Limitations on Defense Evidence*

Defendant contends that two asserted errors in limiting the testimony of defense witnesses deprived him of his right to present a defense, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

### 1. *Dr. Loftus*

At defendant's second trial, Dr. Geoffrey Loftus, a professor of psychology at the University of Washington in Seattle, was permitted to testify as an expert on the subject of memory, specifically memory as it functions during the stress of witnessing a crime or other disturbing event. As a witness, his thesis was that memory's function should not be compared to a recording device. Rather, memory is a creative endeavor that employs fragments of perception in the construction of a coherent narrative of an event. Dr. Loftus also commented upon the function of stress, intoxication, bias, and the lapse of time on a witness's ability accurately to recall events such as violent crimes. He commented specifically that witnesses who observe or feel threatened by weapons often fail to pay attention to other circumstances. Among several other topics, he also commented upon the effect of events subsequent to a crime upon a witness's recollection of the crime itself, the

weight to be accorded the degree of confidence expressed by a witness in an identification, and cross-racial identification. (As already noted, defendant is African-American. Some of the identification witnesses were African-American and some were White.) The court gave a pattern jury instruction specifically advising the jury that many of the topics touched upon by Dr. Loftus, including stress, lapse of time, focus upon a weapon, the witness's confidence in his or her identification, and problems of cross-racial identification, were relevant to their evaluation of the identification witnesses. (See CALJIC No. 2.92.) Defense counsel relied extensively upon Dr. Loftus's testimony in closing argument to the jury.

Defendant nonetheless claims prejudicial error occurred when the trial court placed a limitation upon Dr. Loftus's testimony.

Defense counsel had sought to call Dr. Loftus as a witness at defendant's first trial, but the court excluded his testimony pursuant to Evidence Code section 352. The court announced that the same ruling would remain in effect for the second trial. After the eyewitnesses testified at the second trial, defendant urged the court to reconsider. Further arguments of counsel ensued, and defendant made a thorough offer of proof as to the subjects upon which it was proposed the expert would testify. Placing the burden on defendant to establish the relevance of the evidence, and the burden on the prosecution to support its claim that the evidence should be excluded pursuant to Evidence Code section 352, the court reversed its earlier ruling, concluding all of the subject matter proposed for expert testimony was relevant and sufficiently probative, with very limited exceptions described below.

Defense counsel proposed to ask Dr. Loftus to "testify to unconscious transference. And . . . what that is[,] is if [defendant] had been seen in that neighborhood at some earlier time, either that day or some previous day, some of the witnesses may have recognized him on that basis, rather than the observation itself, but as being someone they had seen in the area."

The court declined to permit this line of questioning, determining that the "unconscious transference" evidence was irrelevant and commenting that "it would be entirely speculative based on this record to suggest that any of the witnesses who testify in this case would be unconsciously transferring a prior examination of the [d]efendant at the scene to this event." The court went on to explain that the evidence was to a certain extent cumulative to other admissible evidence: "To the extent that the transference refers to other things such as seeing him in a photograph or seeing him in a prior proceeding, that is able to be explained under those theories and offers of testimony."

As noted, the court determined that most of the proposed expert testimony was admissible: "The remaining theories of . . . Dr. Loftus's testimony of

factors such as duration, distance, attention, weapon focus, stress, cross-racial identification, retention intervals, effect of prior trial and photo bias, statistical versus chance identification, and the relationship between confidence and accuracy, I find all to be relevant to these proceedings."

The court reiterated the limitations it was imposing on Dr. Loftus's testimony, referring both to relevance and undue confusion of the jury: "[H]e may not make reference to the unconscious transference by seeing someone at the scene. Those are facts as I already indicated are irrelevant. And they should not be added to confuse the jury and cause them to speculate that maybe someone did see Mr. Cornwell there before, since there was no evidence he was ever there before." Defense counsel acknowledged that he understood the court's ruling.[5]

On appeal, defendant complains that the court erred in refusing to "permit Dr. Loftus to explain the concept of 'unconscious transference,' that is, if the witnesses had seen defendant at or near Cashland weeks or months before the crime, they might have based their identification of defendant as the robber on their earlier sighting, and not on what they saw at the scene of the crime." According to defendant, such testimony would have been relevant because, in testimony subsequent to the hearing on Dr. Loftus's testimony, Michael Johnson testified that defendant had been present at the scene "a couple of months" before the crime. Defendant surmises that he may have been present on the same occasion at which certain identification witnesses previously had been at Cashland. He points out that Kimberly Scott testified that Michael Johnson ordinarily worked at Cashland only on the first day of the month. According to defendant, it follows that Johnson "probably" saw him (defendant) at Cashland on the first of the month. Further, defendant claims, there was evidence that three identification witnesses were present at Cashland to transact business on the busiest day of the month, which would coincide with the first business day of any month. He refers to Cassandra Henderson, who was outside waiting for her children to transact business, Susan Erickson, who was inside Cashland, and Frances Rivers, who was waiting for her sister to transact business. Defendant further observes that one of the witnesses testified that she came to Cashland to cash her welfare check on a monthly basis. According to defendant, "[t]hese undisputed facts give rise to a

---

[5] The People assert that the trial court properly excluded elements of Dr. Loftus's testimony pursuant to Evidence Code section 352. The People also assert that defendant forfeited the claim that the limitation on the expert's testimony constituted a violation of defendant's constitutional right to present a defense. The People note that defendant did not make such a claim in the trial court. We need not reach the question whether the constitutional claim was forfeited. (*People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93], disapproved on another point in *People v. Ray* (1996) 13 Cal.4th 313, 369, fn. 2 [52 Cal.Rptr.2d 296, 914 P.2d 846].) Even assuming, without deciding, that defendant's constitutional claim was preserved, it lacks merit, as explained in the text above.

reasonable inference that these eyewitnesses had, perhaps unwittingly, observed defendant on a prior occasion. 'Standing alone the inference may have been weak, but that does not make the evidence irrelevant.' "

 Defendant does not claim he renewed his efforts to broaden the testimony of Dr. Loftus after Michael Johnson testified he had seen defendant at Cashland on a prior occasion. Moreover, the question whether defendant presented an adequate foundation to establish the relevance of this line of questioning lies within the trial court's broad discretion. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175 [64 Cal.Rptr.2d 892, 938 P.2d 950].) Additionally, even if the "unconscious transference" theory was of some tenuous relevance under the facts presented to the court, the court also excluded the line of questioning because of its tendency to confuse the jury. Defendant certainly did not present evidence that any of the identification witnesses *had* seen defendant at Cashland on a previous occasion, and the chain of inference recited above in support of the claim that the witnesses and defendant *might* have been at the establishment on the same day and at the same time is highly speculative. It also would be speculative to draw the inference that, even had their prior visits to Cashland coincided, the witnesses unconsciously had observed defendant. Expert testimony concerning the possibility that a prior sighting could have influenced a witness's identification might have led the jury to believe there *was* evidence the witnesses had observed defendant prior to the commission of the crime. Moreover, the court permitted thorough questioning of the identification expert on multiple topics that were highly relevant to the facts of the case; the court reasonably could conclude the time necessary to develop the "unconscious transference" theory was not worth the speculative probative value of the evidence.

 "Exclusion of evidence as more prejudicial, confusing or distracting than probative, under Evidence Code section 352, is reviewed for abuse of discretion." (*People v. Holloway* (2004) 33 Cal.4th 96, 134 [14 Cal.Rptr.3d 212, 91 P.3d 164].) But "exclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684 [248 Cal.Rptr. 69, 755 P.2d 253].) The trial court acted within its discretion in concluding that, even if relevant, the very limited and speculative relevance of the evidence and its marginal probative value was outweighed by the time necessary to explain the point and by the potential that the evidence would confuse the jury. Moreover, any possible error cannot have been prejudicial, in light of the broad scope of the far more significant testimony the expert was permitted to give, the instruction focusing the jury's attention on many of the factors relied upon by the expert, and the circumstance that defense counsel was permitted to and did weave in the expert's testimony throughout his extensive evaluation of the eyewitness testimony.

■ Citing *Chambers v. Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038], defendant claims that exclusion of testimony on the subject of "unconscious transference" violated his federal constitutional right to present a defense. We are not persuaded. A defendant has the general right to offer a defense through the testimony of his or her witnesses (*Washington v. Texas* (1967) 388 U.S. 14, 19 [18 L.Ed.2d 1019, 87 S.Ct. 1920]), but a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon this right (*People v. Lawley, supra,* 27 Cal.4th at pp. 154–155; *People v. Lucas* (1995) 12 Cal.4th 415, 464 [48 Cal.Rptr.2d 525, 907 P.2d 373]). The excluded evidence in the present case was not so vital to the defense that due process principles required its admission. (See *People v. Hawthorne* (1992) 4 Cal.4th 43, 56–58 [14 Cal.Rptr.2d 133, 841 P.2d 118]; *People v. Babbitt, supra,* 45 Cal.3d at p. 684.) Although the high court in *Chambers* determined that the combination of state rules resulting in the exclusion of crucial defense evidence constituted a denial of due process under the unusual circumstances of the case before it, it did not question "the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." (*Chambers v. Mississippi, supra,* 410 U.S. at pp. 302–303.) Defendant is unable to point to the exclusion of evidence of vital or significant probative value (see *People v. Babbitt, supra,* 45 Cal.3d at p. 684), and the court accorded him broad latitude to examine Dr. Loftus, including examination on the far more probative question whether the witness's *proven* observation of defendant in photo lineups or at the prior trial might have affected the confidence with which they identified him in the present case. (See *People v. Ramos, supra,* 15 Cal.4th at pp. 1178–1179.)

### 2. *Dr. Shoenfeld*

The defense called Dr. Eugene Shoenfeld, a psychiatrist with particular expertise in the field of drug addiction and the properties of heroin and methadone, who testified concerning the effect of those substances on the perception, ability to recall, and veracity of persons using them.

Defense counsel questioned Dr. Shoenfeld about Elavil, lithium, and Stelazine, which are psychotropic medications that Roland Johnson testified he was taking at the time of the events underlying the present crime. Instead of pursuing the question of the effect of such medication on the ability of a person to perceive and recollect, however, defense counsel inquired as to the condition for which Stelazine was prescribed. Dr. Shoenfeld testified that Stelazine is a "[m]ajor tranquilizer[] . . . generally used in the treatment of psychoses. Stelazine is one of the older drugs used for the treatment of psychosis. It's related closely to [T]horazine, for example. It's another antipsychotic drug." When defense counsel asked, "[W]hat do you mean by

psychoses? Is that some sort of mental condition?," the prosecutor objected. The prosecutor explained to the court that he feared defense counsel was "trying to establish what's wrong with Roland Johnson mentally and physically based on these short questions of what drugs he was taking. And I don't believe [there is] a proper foundation for this doctor to now discuss that we use this drug for psychoses. We don't know what—anything about [why] Roland Johnson . . . was prescribed this drug, and I don't think [defense counsel] has laid a foundation for that. [¶] And I would note that he [Roland Johnson] said he used them as needed. And without knowing more about it, this doctor's never treated him, we don't know when, why he's on them."

In questioning by the court, Dr. Shoenfeld commented that, in addition to its use as an antipsychotic, Stelazine may be prescribed for relief of nausea or as a tranquilizer. It was established that the witness had neither examined Roland Johnson nor reviewed Johnson's medical records. The court determined defendant had not established a foundation "from Mr. Johnson's doctor as to whether he, in fact, has prescribed [S]telazine . . . . Roland Johnson's not even qualified to tell us for sure what he's getting. More importantly, we don't have a medical opinion why it was prescribed for him." The court also commented that, according to Dr. Shoenfeld, the drug is prescribed for reasons other than psychosis, and hence further questioning concerning the psychiatric condition for which Roland Johnson might have been prescribed the drug would be speculative.

The court ultimately ruled that defense counsel could explore the likely *effects* upon a person taking Stelazine and lithium but that counsel could not elicit Dr. Shoenfeld's opinion concerning the probable condition for which the drugs had been prescribed. The court explained that this sort of "reverse diagnosis" on the basis of prescribed medication was too speculative, referring to Evidence Code section 352. The court characterized the line of inquiry as speculative, because Dr. Shoenfeld had not examined Roland Johnson or prescribed medication for him. In addition, the court pointed out that defendant could introduce direct evidence of Roland Johnson's condition and the reasons he took the medication by calling his prescribing physician as a witness.

 Contrary to defendant's claim, neither the trial court's application of the rule of evidence requiring the proponent of evidence to supply an adequate foundation (Evid. Code, § 403), nor the court's exercise of discretion pursuant to Evidence Code section 352, deprived defendant of his Sixth Amendment right to present a defense.[6] "The decision whether foundational evidence is sufficiently substantial is a matter within the court's discretion."

---

[6] As with the preceding claim, we assume without deciding that the constitutional claim was preserved by defendant's efforts to meet the prosecutor's evidentiary objections, despite

(*People v. Lucas, supra*, 12 Cal.4th at p. 466.) We see no abuse of discretion in the present case, particularly because Dr. Schoenfeld lacked personal knowledge concerning Johnson's condition. (See *ibid.*) In addition, the physician informed the court that there were a number of reasons Stelazine might be prescribed. Defendant was able to elicit testimony from Dr. Shoenfeld demonstrating that Stelazine primarily is used to treat psychosis, and thus the jury could have surmised that Johnson suffered from some variety of psychosis. More specific information concerning Johnson's condition could have been made available by calling Johnson's prescribing physician as a witness. There was nothing fundamentally unfair about applying ordinary rules of evidence to exclude speculative opinion testimony, especially because of the availability of an obvious other source for the same information, as pointed out by the trial court. (See *People v. Ramos, supra*, 15 Cal.4th at pp. 1175–1176.)

### D. *Spectator Misconduct*

Defendant contends "continuing and unchecked" spectator misconduct violated his right to a fair trial and a trial by an impartial jury, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. He refers to the following circumstances.

After the jury rendered its guilty verdict, defendant requested an evidentiary hearing and moved for new trial on the basis of spectator misconduct he asserted occurred during trial. In support, he offered the declarations of Defense Attorney Lyons, defense investigator Michael Sailors, and defendant's wife, Carolyn Cornwell.

In his declaration, Defense Counsel Lyons stated that spectators had burst into the courtroom during the defense closing argument, and that spectators had rolled their eyes and sighed audibly. He believed the spectators were attempting to influence the jury.

Sailors declared that he had observed "constant whispered remarks, snickers, laughter and gasps of disbelief from both Ms. Reagan [the victim's daughter] and Ms. Scott [the owner of Cashland], and similar activity from the group seated in front of them" during certain defense testimony. He believed the remarks "could have been overheard by the jurors," who seemed to redouble their attention to the testimony during these episodes—possibly, Sailors believed, in order to "shut out" the disturbance.

Defendant's wife stated in her declaration that she observed members of the victim's family gesturing, whispering, and frowning in response to

defendant's failure to have claimed, in the trial court, that constitutional principles required the admission of the evidence.

testimony. She observed Ms. Scott, who was the owner of Cashland and was the victim's romantic partner, leave her seat briefly during prosecution witness Erickson's testimony, then greet and touch Erickson as she left the courtroom. Mrs. Cornwell also claimed one juror observed Ms. Scott making a dismissive gesture and statement concerning questions put to Roland Johnson during defense cross-examination—questions related to Johnson's potential access to information concerning the crime through newspaper reports. Mrs. Cornwell declared that Ms. Scott gasped, sighed, and shook her head visibly during testimony she found objectionable and that, addressing a spectator seated behind her, she stated: "you think he would just jump up saying I did it, I did it." According to Mrs. Cornwell, Ms. Scott was admonished by the prosecutor to stop conversing about the case with the other spectator. Mrs. Cornwell stated that, when the prosecutor remarked in closing argument that defendant had underestimated Reagan, Ms. Scott audibly said "that's right."

The prosecutor opposed defendant's motion for an evidentiary hearing and for a new trial, noting that because the jurors' mental processes were not subject to inquiry, an evidentiary hearing could establish only whether or not the jurors observed the alleged misconduct. The prosecutor made an offer of proof based upon his own observations, stating that (1) the juror referred to in Mrs. Cornwell's declaration who allegedly observed Ms. Scott's dismissive gesture was an alternate who did not serve during the guilt phase deliberations; and (2) the prosecutor's admonition to Ms. Scott occurred in response to a conversation he had witnessed on an occasion when the jury was not present in the courtroom. The prosecutor reminded the court that it had witnessed the alleged disturbance during defense counsel's closing argument, and contended the incident had been inadvertent and at most had constituted a brief distraction. The comment made during the prosecutor's closing argument "wasn't a loud outburst of screaming, but you could hear it. That was the only thing I heard throughout the entire trial. And I . . . thought the Court heard it, because I thought you mentioned something to the people who were here present in court afterwards. Make sure you keep it down, something to that effect."

The prosecutor urged: "I'm asking this court to assume that they [the jurors] did observe some of these items and to rule that because of the nature of them and trivial nature of them, that there's no substantial likelihood that could have possibly influenced the jury."

The court carefully described the layout of the courtroom for the record. It noted that it frequently had glanced at counsel during trial, and at those times could not help but observe the spectators. The court pointed to the prosecutor's invitation to the court to assume the defense allegations were true,

noting that the concession eliminated the need for an evidentiary hearing to "resolve material, disputed issues of fact." The court also commented that "[t]he persons necessary to shed light on the actual physical actions are all available to the [c]ourt without the jury having to come forward." It also commented upon the potentially disruptive effect of examining the jury between the conclusion of the guilt phase and commencement of its continued service during the penalty phase. The court denied the defense's motion for an evidentiary hearing.

The court subsequently denied a motion for new trial based upon the alleged misconduct,[7] explaining that it was "aware of the overall conduct [of spectators] and the overall impact that the matter would have" and therefore was in a unique position to interpret the "otherwise undisputed facts." As to each allegation, the court commented that, to the extent it witnessed the events, they were minor and innocuous in their impact. For example, the court stated that when the spectators entered the courtroom during defense closing argument, they did not "burst" in but merely entered, permitting the noise from the hallway to penetrate the courtroom. The court found that the statement "that's right," made by a spectator during the prosecutor's closing argument, could be heard only as a soft sibilant at the front of the courtroom. The court acknowledged it had admonished the spectators concerning courtroom demeanor, but stated this had occurred after the bailiff noted there had been a great deal of "eye rolling."

The court characterized Ms. Scott's demeanor and behavior during trial as polite and quiet, and added that the jury would not interpret any comments made by her as based on personal knowledge, because she did not witness the crime.

As for the remaining alleged incidents, the court did not observe them but, accepting each of them as true, concluded they were minor and innocuous, as the court explained at length. The court also commented that it had observed the jury frequently during the trial, and that the jurors always seemed attentive and never distracted by events involving the spectators. Having compared the allegations with those in other cases, including *People v. Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984] (disapproved on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618]), the court concluded "there is no

---

[7] The trial court raised the question whether the motion was timely, commenting that defense counsel were under an obligation to bring the alleged misconduct to the court's attention as soon as they became aware of the problem. In the present case, in lieu of declarations concerning when the defense became aware of spectator problems, the prosecutor accepted defense counsel King's assertion that he, King, had not been aware of the problems prior to the rendering of the verdict and that cocounsel, Lyons, was not available. The trial court therefore accepted the motion as timely, a determination that respondent does not contest.

substantial likelihood, there is no likelihood whatsoever that anything that occurred during this [trial] deprived the [d]efendant of a fair trial and meets the standards applicable to granting a new trial pursuant to Penal Code section 1181 or any [c]onstitutional standard for due process of law."

Although spectator misconduct constitutes a ground for new trial "if the misconduct is of such a character as to prejudice the defendant or influence the verdict," the trial court must be accorded broad discretion in evaluating the effect of claimed spectator misconduct. (*People v. Lucero* (1988) 44 Cal.3d 1006, 1022 [245 Cal.Rptr. 185, 750 P.2d 1342].) The reason is obvious: the court ordinarily is present in the courtroom at any time when a spectator engages in an outburst or other misconduct in the jury's presence and is in the best position to evaluate the impact of such conduct on the fairness of the trial. (See, e.g., *Messer v. Kemp* (11th Cir. 1985) 760 F.2d 1080, 1087.) We believe the trial court in the present case acted within its discretion in concluding that the alleged spectator misconduct was not of the sort that would be prejudicial and influence the verdict. As the court explained, defendant assumed that the jury witnessed various alleged acts of misconduct or viewed the events as disruptive or prejudicial. From its own observations, however, the court was satisfied that defendant's assumptions were unjustified and that the effect of the incidents was innocuous or, at most, trivial.[8]

The trial court's proper exercise of discretion also is illustrated by a comparison of these incidents with other cases that uphold the discretion of trial courts in the face of claims of spectator misconduct. In *Lucero*, for example, the anguished mother of a child murder victim screamed incriminating information to the jury as it departed for deliberation and was removed from the courtroom, still screaming. (*People v. Lucero, supra,* 44 Cal.3d at p. 1022.) Although the conduct in the *Lucero* case was far more dramatic than anything alleged in the present case, we determined the court acted within its discretion in denying a motion for mistrial. (*Id.,* at pp. 1023–1024; see also *People v. Hill, supra,* 3 Cal.4th at p. 1002.) In the present case, although more than one incident was alleged and, unlike the situation in *Lucero*, there was no pointed admonition from the court, defendant does not claim that the spectators actually attempted to convey information to the jury; there was no dramatic, anguished outburst, and the spectator conduct, even taking defendant's claims at face value, was not particularly disruptive or likely to influence the jury.

---

[8] We agree with the trial court in the present case that, in general, a party promptly should object to audible comments from spectators that have the potential to prejudice the jury, thereby enabling the trial court to correct the problem at the outset.

■ As defendant concedes, prejudice is not presumed when spectators misbehave during trial; rather, the defendant must establish prejudice. He was unable to do so in the trial court and has failed in this court as well.[9]

Defendant also claims a denial of due process occurred because the alleged spectator misconduct undermined the fairness of the factfinding process. The record, which establishes the limited nature and impact of any misconduct, refutes this claim.

### E. *Instructional Error—CALJIC No. 2.11.5*

■ As the Attorney General concedes, the trial court erred in instructing the jury pursuant to CALJIC No. 2.11.5: "There has been evidence in this case indicating that a person other than the defendant was or may have been involved in the crime for which the defendant is on trial. [¶] There may be many reasons why such a person is not here on trial. Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted. Your sole duty is to decide whether the People have proved the guilt of the defendant on trial." A court should "not use this instruction if the other person is a witness for either the prosecution or the defense." (Use Note to CALJIC No. 2.11.5 (7th ed. 2005), p. 43.) When an accomplice (as both prosecution witness Roland Johnson and defense witness Michael Johnson may have been) testifies, the instruction might suggest to the jury that it need not consider the factors it otherwise would employ to weigh the credibility of these witnesses, such as the circumstance that the witness has been granted immunity from prosecution in return for his or her testimony. (See *People v. Williams* (1997) 16 Cal.4th 153, 226–227 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Price* (1991) 1 Cal.4th 324, 445–446 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

■ We conclude, however, that the error was harmless. Other instructions adequately directed the jury how to weigh the credibility of witnesses. (See CALJIC Nos. 2.20 [weighing credibility and considering such factors as the existence of bias, interest, or other motive to lie], 3.00–3.11 [specific instructions on accomplice testimony].) The court also specifically informed the jury to keep in mind any sentencing benefits received by a witness in the jury's evaluation of the witness's credibility. As our cases recognize, such instructions adequately channel the jury's consideration of the testimony of possible accomplices even in the face of error in instructing pursuant to CALJIC No. 2.11.5. (See *People v. Crew* (2003) 31 Cal.4th 822, 845 [3 Cal.Rptr.3d 733, 74 P.3d 820]; *People v. Williams, supra,* 16 Cal.4th at p. 227.)

---

[9] Defendant's attempt to characterize the issue as one involving jury misconduct giving rise to a presumption of prejudice is unavailing. There is no indication of misconduct by any juror.

Ordinarily, defendants contend, error in instructing pursuant to CALJIC No. 2.11.5 is prejudicial because it diminishes the ability of the defense to impeach the prosecution's witnesses. In the present case, defendant adds a contention that the instructional error may have caused the jury to fail to consider defense witness Michael Johnson's denial of culpability as evidence in support of defendant's position. Defendant asks us to believe that the jury would discount whatever exculpatory weight otherwise was produced by Michael Johnson's denial that he *was* an accomplice simply because the instruction informed them they should not consider or speculate on why Michael Johnson was not being prosecuted. We are not persuaded it is reasonably likely that, taken as a whole, the instructions misled the jury in the manner claimed by defendant or that they relieved the prosecution of any part of its burden of proof. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1212 [17 Cal.Rptr.3d 532, 95 P.3d 811] [standard of review for comparable asserted instructional error is whether the instructions as a whole were reasonably likely to mislead the jury]; *People v. Catlin* (2001) 26 Cal.4th 81, 151 [109 Cal.Rptr.2d 31, 26 P.3d 357] [same].) In the present case, the instructions as a whole supplied adequate direction concerning the process of evaluating the testimony of the witnesses.[10]

Defendant contends the erroneous instruction pursuant to CALJIC No. 2.11.5 substantially interfered with the jury's consideration of exculpatory evidence, in violation of the Fifth and Sixth Amendments to the federal Constitution. Under the circumstances, he claims, the error requires reversal unless it was harmless beyond a reasonable doubt, applying the *Chapman* (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]) standard of review. Defendant's citation to cases such as *Chambers v. Mississippi, supra,* 410 U.S. 284, is of no assistance to his claim. He asserts error in instructing the jury, not in the admission of evidence, and, as we have observed, the instruction did not substantially interfere with his ability to introduce exculpatory evidence. Although certain instructional error—such as failure to instruct on an element of the charged offense—constitutes a violation of the federal Constitution and requires reversal unless the error was harmless beyond a reasonable doubt (*People v. Flood* (1998) 18 Cal.4th 470, 502–504 [76 Cal.Rptr.2d 180, 957 P.2d 869]; see also *People v. Cole, supra,* 33 Cal.4th at p. 1208), any error in the present case was not of a similar magnitude and did not implicate defendant's federal constitutional rights.

---

[10] Although Roland Johnson was an important witness for the prosecution, and Michael Johnson was of modest importance to the defense case, we do not agree with defendant's claim that "[d]efendant could not be convicted unless the jury credited Roland's testimony," nor is it true that defendant could not be convicted if the jury credited Michael Johnson's claim that he did not act as defendant's "inside man."

### F. *Prosecutorial Misconduct—Griffin Error*

It was significant to the prosecution's case that the automobile defendant had borrowed from his girlfriend, Juanita Washington, had been parked near the scene of the homicide at or near the time of the crime. Washington testified defendant told her that his work had brought him to the neighborhood where he left the vehicle, but defendant's employer testified otherwise.

During closing argument, the prosecutor commented upon the above circumstances, noting the close proximity of the vehicle to the scene of the crime, the ease of access from the crime scene to the alley that led to the parking space, and the circumstance that defendant did not reside or work in the area where the crime was committed. The prosecutor continued: "Have you heard one single piece of evidence from the defense that tells you why that car was there? [¶] Weren't you waiting for it? Weren't you waiting for it? I'm sure you were waiting for it. You know that's uncontroverted. You knew that can't be denied." The prosecutor questioned the likelihood the vehicle would be parked so near the crime scene if defendant had not been involved in the crime, adding: "And what are the odds that we go through this whole trial and not a single witness came in here to take the stand and tell you why. [¶] There is no why. The only why points directly to [defendant], that's why. [¶] There is no other explanation [aside from defendant's guilt]. If there was, you saw the investigator, you know he's been working on a case. You saw witnesses that have been subpoenaed by the defense, they could bring in anybody they want and they could bring in a person to say why that car was parked there. But you already know why." In his rebuttal argument, the prosecutor again stated that the defense "didn't bring a single person in here to explain why that car was there."

Defendant contends the quoted remarks constituted a comment on his failure to testify in his own defense, a violation of his privilege against self-incrimination as secured by the Fifth Amendment to the United States Constitution. (See *Griffin v. California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 85 S.Ct. 1229].)

We disagree. Although a prosecutor is forbidden to comment " 'either directly or indirectly, on the defendant's failure to testify in his defense,' " the prosecutor may comment " 'on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses.' " (*People v. Turner* (2004) 34 Cal.4th 406, 419 [20 Cal.Rptr.3d 182, 99 P.3d 505].) The prosecutor's comments fell within the latter category. The presence of Washington's vehicle close to the crime scene and near the time of the crime constituted material inculpatory evidence, and it was fair comment to draw the jury's attention to the failure of the defense to call

witnesses who might logically explain the presence of the vehicle. We do not view the prosecutor's argument as a comment upon defendant's failure to testify. We are not persuaded otherwise by defendant's claim that the prosecutor's argument would be understood as a comment on defendant's failure to testify because only defendant could explain the vehicle's location. Defense witness Mackey, who testified he was with defendant much of the day, defendant's employer, or Washington, who lent defendant the vehicle, all were persons who might be expected to know why the vehicle was parked where it was, and the circumstance that they did not testify concerning that point was a fair subject for comment by the prosecutor.

Moreover, defendant failed to object to the prosecutor's comments. We are not persuaded that we should overlook this failure, which ordinarily bars consideration of such a claim on appeal, on the ground that a prompt admonition by the court could not have cured any harm. (See *People v. Medina* (1995) 11 Cal.4th 694, 756 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Benson* (1990) 52 Cal.3d 754, 794 [276 Cal.Rptr. 827, 802 P.2d 330].) Defendant has not offered any persuasive explanation in support of his theory that the jury would have disregarded any such admonition from the court.[11]

### G. *Prosecutorial Misconduct—Comments on Discipline and a Free Society*

At the beginning of his argument to the jury, the prosecutor discussed the role of the jury in a democratic society. He asked the jury to understand the somewhat paradoxical interplay between the freedom that democracy promises and the discipline democracy requires of its citizens.

In the context of these remarks, the prosecutor commented on the rule of law: "[A]nybody who's lived a life . . . knows that in reality discipline is the cornerstone of freedom. And that's what we are doing here today, and that's why I'm bringing this up." The prosecutor pursued the theme that law and its enforcement constitute the "[d]iscipline [that] is the cornerstone of freedom." He observed: "I mean, if you don't have some kind of control, some type of law and order in your society, you have chaos, obviously. And the next step from chaos is anarchy. And you don't have to be a history major, you just need to read the newspaper once in a while and you can see what it's like in those Third World countries where there is no law and order, where there is no discipline. Do those people feel free because there's nobody looking over

---

[11] Defendant's contention that defense counsel's failure to object constituted ineffective assistance of counsel fails because, as demonstrated in the text above, the comments were not objectionable under *Griffin v. California, supra,* 380 U.S. 609, 615. (See *People v. Lucas, supra,* 12 Cal.4th at p. 475.)

their shoulder or because there's no law? You don't even have to go that far. You can go right here in Sacramento in some of the neighborhoods where people were afraid to go out on their porch at night, [fearing] they might get involved in a drive-by shooting. Those people, what would they give for a little bit of discipline, a little bit of control?"

The prosecutor explained he was making these points because he understood that jury service makes uncomfortable demands upon citizens. In the prosecutor's words, "[y]ou have gotten yourself into the duty that every citizen has, but every citizen wishes [he or she] could avoid." The prosecutor went on to acknowledge how difficult it is for most persons to impose discipline on others, but expressed the view that most individuals are willing to do so—as, for example, by firing an incompetent employee—"because they realize it's essential to our society." Bringing the point closer to home, the prosecutor asked the members of the jury to shoulder the unenviable task of judging defendant just as they would shoulder the task of firing an incompetent employee. He went on to caution those quick to make decisions to be patient and open-minded during deliberations, and urged those who had difficulty reaching a decision not to act simply on the basis of a reluctance to participate in imposing harsh sanctions on defendant.

Defendant contends these remarks constituted an appeal to the passion and prejudice of the jury, because they focused on the chaos and danger that follow from the absence of law and order. Defendant alleges a violation of his right to trial by jury and to due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution. Defendant claims the prosecutor "implicitly urged the jury to convict defendant in order to bring discipline and freedom to the community" and to "keep society free of crime."

Considering the prosecutor's remarks in their context, as we must (*People v. Lucas, supra*, 12 Cal.4th at p. 475), the prosecutor's argument did not urge the members of the jury to act on the basis of their fear of chaos and crime in the community, but to act with an understanding of the importance of law in the abstract. The prosecutor acknowledged the onerous task faced by the jury in applying the law and in fulfilling its important function. Far from asking the jury to act on the basis of fear, the prosecutor urged the jurors to remain patient, open-minded, and unaffected by emotion during their deliberations. And far from asking the jury to disregard the evidence, the prosecutor asked the jury to sift through it with care.

Although it is improper for a prosecutor to appeal to the passion or prejudice of the jury (*People v. Young, supra*, 34 Cal.4th at p. 1195), there is no indication that the prosecutor's temperate speech concerning the function

of the jury and of the rule of law constituted such an appeal. Moreover, as respondent points out, defendant failed to object to the comments at the time of trial, an omission that ordinarily bars consideration of the claim on appeal. (*People v. Medina, supra*, 11 Cal.4th at p. 756; *People v. Benson, supra*, 52 Cal.3d at p. 794.) Defendant has not supplied any plausible basis for his contention that an objection and admonition could not have cured any harm that assertedly flowed from the prosecutor's remarks, despite his claim that "the harm was done the moment the prosecutor committed the misconduct."[12]

### H. *Restriction on Cross-examination*

As noted above, prosecution witness Roland Johnson claimed it was the prompting of his conscience that caused him, while serving a prison term, to contact law enforcement authorities concerning defendant's role in the death of William Reagan. Johnson testified he also was fearful because he knew he was implicated in the crime; although he was not responding to an active threat, he would be held responsible for it. Law enforcement authorities assertedly were unaware he had any connection with the crime until he came forward.

Seeking to establish Johnson's bias and motive for fabrication, the defense conducted vigorous cross-examination. Defense counsel asked why Johnson's conscience had lain dormant until he was incarcerated, and elicited admissions that Johnson was testifying under a grant of immunity, that he had received a sentence reduction in return for his testimony, and that, when he first contacted the authorities, he did not refer to his conscience but requested an interview with detectives concerning "a matter involving [his] judgment relating to [his] prison sentence." Defense counsel impeached Johnson's credibility in numerous other ways, including by eliciting the information that Johnson had been making his living as a drug dealer, had been taking various psychotropic medications and using marijuana at the time of the crimes, and could have learned facts concerning the crime through news reports. Through this cross-examination, defense counsel provided the jury with evidence that Johnson's testimony was not disinterested, that his hope of early release provided him with a motive for fabrication, and that there were various reasons to doubt his veracity.

On redirect examination, Johnson explained that the grant of immunity followed his admission to law enforcement authorities that he had provided defendant with a weapon. Seeking to demonstrate Johnson's candor and thereby enhance his credibility, the prosecutor asked Johnson whether he had

---

[12] Contrary to defendant's claim, defense counsel's failure to object did not constitute ineffective assistance of counsel, because the prosecutor's remarks came within the bounds of proper argument.

committed other crimes, which Johnson candidly admitted he had, volunteering that he had shot someone but had not been charged with the crime.

Defense counsel further questioned Johnson concerning this shooting. It was during this exchange that defendant alleges the court imposed an unconstitutional limitation upon his right to confront the witnesses against him. In response to defense counsel's questions, Johnson stated that the prior shooting occurred in 1983, that he had not killed anyone, that the shooting occurred while Johnson was dealing in drugs, that Johnson viewed the shooting as having involved self-defense, that no one ever was arrested for the shooting, and that this was the only occasion Johnson had shot anyone.

At this point defense counsel asked Johnson whether he had "ever heard [of] 'Three Strikes and you're out?'" The court sustained the prosecutor's relevance objection, subsequently explaining: "First, any 'Three Strikes' law could not have applied to Mr. Johnson since any crime he would have committed relative to this case would have been before the effective date . . . of the 'Three Strikes' law. And, secondly, I looked back in my notes to look at his prior convictions that were brought out during his impeachment . . . and I noted that [they] . . . do not qualify as strikes. [¶] And, therefore, I did not see any relevance of the 'Three Strikes' law to any motivation of his testimony here."

Defense counsel countered that he was interested in the witness's own understanding of the law, not the state of the law in fact. Counsel hoped to establish that, however misguided Johnson's concern may have been, Johnson feared future incarceration for life under the "Three Strikes" law and that it was this fear that caused him to contact authorities with information concerning the present case. The trial court was not persuaded, reiterating that Johnson was not actually subject to Three Strikes sentencing.

It appears to us that the court's ruling on relevance would not have precluded counsel from asking his question more directly. Counsel simply could have asked Johnson what criminal liability he *believed* he risked for his part in the murder of William Reagan. It was unnecessary to pursue the basis for Johnson's belief, if he had one (such as fearing that he faced a life sentence). In any event, any error in excluding this testimony was harmless as a matter of state law because of the ample other evidence that came before the jury suggesting reasons to believe that Johnson's cooperation with law enforcement was not altruistic and that his testimony was the product of his hope to secure early release from prison.

█ Nor do we believe that any error in the application of state rules of evidence rose to the level of a constitutional violation pursuant to

*Chambers v. Mississippi, supra,* 410 U.S. 284, 295. As the United States Supreme Court has explained, the confrontation clause permits trial courts to retain "wide latitude" to impose limits on cross-examination concerning matters of marginal relevance. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678–679 [89 L.Ed.2d 674, 106 S.Ct. 1431].) In the present case, the *source* of whatever fear Johnson might have entertained that he might face a life sentence was of the most marginal relevance. (See *People v. Frye, supra,* 18 Cal.4th at p. 946 [the source of a witness's knowledge concerning marijuana was of marginal relevance].)

Further, even if we were of the view that the court should not have sustained the prosecutor's objection to the defense questions and that defendant has demonstrated a constitutional violation, any error would be harmless beyond a reasonable doubt. Defense counsel was able to conduct searching cross-examination concerning Johnson's unsavory past and motives for volunteering evidence to law enforcement officials. The jury was provided with an ample basis for doubting Johnson's veracity, without being informed that he feared a life sentence under the Three Strikes law. The jurors knew that he had supplied defendant with the murder weapon in the present case and could have been subject to prosecution as an accomplice in the absence of his cooperation with the police, that he had dealt in drugs, that he had shot another person, that his prison sentence had been reduced as a reward for his testimony, and that he had received immunity from prosecution as an accomplice to a murder in exchange for his testimony. As we have explained, "unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witness's] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (*People v. Frye, supra,* 18 Cal.4th at p. 946, quoting *Delaware v. Van Arsdall, supra,* 475 U.S. at p. 680.) Questioning Johnson concerning his fears of a life sentence under the Three Strikes law would *not* have afforded the jury a significantly different impression of Johnson's credibility.

## I. *Evidence Concerning Defendant's Financial Status*

Defendant contends admission of evidence concerning his depleted bank balance in May 1993 and his limited income in the weeks prior to the commission of the crime constituted a violation of his right to due process of law. He refers to evidence that three of his checks had been returned to his bank for insufficient funds during the month of May and that two checks were returned for insufficient funds in June 1993. Evidence was admitted that defendant's bank account contained $1.20 on May 21, 1993 and that defendant deposited $100 on May 28 and $300 on June 3, 1993. Defendant earned approximately $1,500 in May 1993. Cable service to defendant's home was

discontinued on April 16, 1993 for nonpayment of the bill, and was restored on June 4, 1993. Referring to this evidence, the prosecutor stressed at closing argument: "It's not because [defendant] is destitute and that he was desperate for money. That is not the reason the evidence of his finances [was] put on. That was to show he didn't have money and then did. . . ."

We observe first that the claim is forfeited because, as defendant concedes, at trial defense counsel failed to object on any basis to the admission of this evidence. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1076 [119 Cal.Rptr.2d 859, 46 P.3d 335].) In any event, the claim lacks merit.[13]

Ordinarily it would be unfair to persons in difficult financial circumstances to permit general evidence of their poverty to be introduced for the purpose of establishing a motive for theft or robbery. The risk of causing suspicion of indigent persons generally outweighs the probative value of such evidence. (*People v. Koontz, supra*, 27 Cal.4th at p. 1076 [evidence of a defendant's poverty "generally may not be admitted to prove a motive to commit a robbery or theft; reliance on such evidence is deemed unfair to the defendant, and its probative value is outweighed by the risk of prejudice"]; see also *People v. Wilson* (1992) 3 Cal.4th 926, 939 [13 Cal.Rptr.2d 259, 838 P.2d 1212].)

Relying on federal court authority, a recent Court of Appeal decision explains that although evidence of poverty to establish motive for theft seems logically relevant, " '[t]he trouble is that it would prove too much against too many.' [Citation.] As the court explained in *United States v. Mitchell* (9th Cir. 1999) 172 F.3d 1104, 'Lack of money gives a person an interest in having more. But so does desire for money, without poverty. A rich man's greed is as much a motive to steal as a poor man's poverty. Proof of either, *without more*, is likely to amount to a great deal of unfair prejudice with little probative value.' " (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 102 [13 Cal.Rptr.3d 878], italics added.)

On the other hand, evidence of the defendant's indebtedness or relative poverty may be admitted without undue prejudice to persons of limited means in order "to eliminate other possible explanations for a defendant's sudden wealth after a theft offense." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1024 [254 Cal.Rptr. 586, 766 P.2d 1]; see also *People v. Koontz, supra*, 27 Cal.4th at p. 1076; *United States v. Weller* (10th Cir. 2001) 238 F.3d 1215, 1221 [trial court properly admitted evidence of the defendant's possession of large sums of money after a robbery, when prior to

---

[13] Because it was within the court's discretion to admit this evidence, counsel's failure to object did not constitute ineffective assistance of counsel, as explained in the text, above.

the crime "she had an empty bank account, 'maxed out' credit cards, and no other obvious source from which to obtain cash"].) A recent federal court decision supplies a helpful illustration: "If a man is notoriously broke and cannot buy a pack of cigarettes Tuesday, that night a laundromat is burglarized, and on Wednesday the man buys a carton of cigarettes and a $40 bottle of scotch, all with quarters, the man's financial circumstances have obvious and significant probative value." (*United States v. Mitchell, supra,* 172 F.3d at p. 1108.)

Persons at most economic levels have limits to their wealth; sudden possession of greater wealth than usual is relevant circumstantial evidence in a theft-related prosecution, but does not present a risk of unfair prejudice to persons of limited means. Contrary to defendant's claim that admission of the evidence rendered his trial fundamentally unfair, it was within the trial court's discretion to admit evidence of defendant's financial circumstances, in light of the evidence of his "sudden wealth" and, indeed, his possession of currency in the denominations taken in the charged robbery, immediately following the robbery. The possibility that he came into possession of the money legitimately was rendered more doubtful by the circumstances that his earnings were extremely modest and his bank account was depleted at the time of the crime. Defendant's effort to dress his claim in constitutional garb adds nothing to the merit of his position. He cites *Estelle v. McGuire* (1991) 502 U.S. 62 [116 L.Ed.2d 385, 112 S.Ct. 475], but that case does not suggest that the admission of relevant evidence in a criminal trial led to a denial of due process. (*Id.,* at pp. 70–71 [permitting admission of evidence of battered child syndrome to be admitted as relevant evidence in a prosecution for murder of a child and observing that, although the due process clause " 'guarantees the fundamental elements of fairness in a criminal trial,' " it does not turn the high court into a body responsible for making rules of evidence for the states].)

Defendant claims that the admission of this evidence as part of the prosecution's case-in-chief "forced [him] to explain that he was not impecunious, a difficult task given that much of [his] income apparently came in under-the-table cash payments for carpentry work and sales of refurbished vehicles," and that "[t]o force a person to establish income is the 'relative disadvantage' [that has been noted] as the inherent danger of admitting this sort of evidence." Defendant, having failed to object below, did not offer this explanation in the trial court, so we cannot fault that court for failing to identify the potential source of prejudice to which defendant alludes. In any event, the evidence in question was relevant to the prosecution's case and was admissible pursuant to the authority cited above, and its introduction no more "forced" defendant to respond than any other probative evidence presented by the prosecution. Nor did the evidence unfairly "force" defendant to respond under circumstances in which a person of greater wealth who

suddenly possessed an unusual sum of money would not be forced to respond. We also do not understand why it would have been particularly difficult for defendant to secure evidence from various employers or clients establishing that they had paid him for his work, even "under the table."

Also unpersuasive is defendant's claim that there was no evidence of the "suddenness" with which he came into possession of $1,500 in cash, and that the court merely assumed he acquired the money suddenly. Prior to admission of the evidence of which defendant complains, defendant's girlfriend testified that she was concerned about his purchase of an automobile on the date of the crime because she and defendant were then experiencing financial difficulties. It was within the court's discretion to conclude the evidence did not constitute mere general evidence of poverty going to the issue of motive, but instead constituted admissible circumstantial evidence that defendant was the person who committed the crime.

### J. *Cumulative Error*

Having reviewed defendant's claims, we have identified only one clear error, namely the giving of an unmodified instruction pursuant to CALJIC No. 2.11.5. The instructional error was harmless and, even assuming there was additional error in the trial court's limitation on Roland Johnson's testimony, any so-called cumulative error was harmless even under the most exacting standard of review.

### K. *Motion for New Trial—Ineffective Assistance of Counsel*

Relying upon this court's decision in *People v. Fosselman* (1983) 33 Cal.3d 572 [189 Cal.Rptr. 855, 659 P.2d 1144], defendant contends the trial court abused its discretion in allegedly refusing to consider a claim of ineffective assistance of counsel in connection with defendant's pro se request for a new trial. Defendant contends that arbitrary deprivation of his right to raise a claim of ineffective assistance of counsel by way of a motion for new trial constituted a violation of his right to due process of law. Making no effort to establish that his ineffective-assistance-of-counsel claim in the trial court had merit, defendant merely contests the court's failure to reach the merits of the claim.

We note at the outset that defense counsel never made a motion for new trial on the basis of ineffective assistance of counsel, nor was defendant permitted actually to file such a motion pro se; the trial court explained that defendant could not do so while represented by counsel. Rather, in hearings spread over several days, the court sought to determine whether defendant had stated grounds for substitution of counsel pursuant to *People v. Marsden*

(1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*), whether defendant was requesting leave to proceed in propria persona, and whether a motion for new trial *should* be filed on defendant's behalf by substitute counsel. The court's ultimate ruling on the matter was based upon an evaluation of the undue time that would be consumed by consideration of an ineffective-assistance-of-counsel claim in the context of such a motion in lieu of consideration by way of a petition for writ of habeas corpus.

The record establishes that on November 2, 1994, after entry of the guilty verdicts, defense counsel informed the court that defendant wished to make a motion for new trial. Defendant personally addressed the court, urging that the attorney who represented him during the guilt phase of the trial had provided ineffective assistance. The court explained that as long as defendant was represented by counsel, a motion for new trial could not be brought by defendant independently, although the court would entertain a motion for substitution of counsel under *Marsden*, *supra*, 2 Cal.3d 118, or for self-representation under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]. Defendant stated various grounds for dissatisfaction with William Lyons, one of his trial counsel, and moved to have him discharged. The trial court initially treated the motion as a *Marsden* motion, carefully examining defendant outside the presence of the prosecutor and encouraging him to make a full statement of the grounds for his dissatisfaction with counsel. The court permitted defendant to explain his concerns very specifically and at great length. The court also questioned defendant and required defense counsel to respond to each of defendant's points, which concerned counsel's asserted failure to investigate, to introduce evidence or call particular witnesses, and to rebut elements of the prosecution's case.

The court concluded that defendant was attacking the *validity* of the guilty verdicts on the ground he had received ineffective assistance of counsel. Concluding the claim was one that could be brought by means of a motion for new trial, the court cited *People v. Fosselman*, *supra*, 33 Cal.3d 572, but observed it would be difficult to expect defendant's attorneys to decide to bring such a motion. The court determined that defendant's allegations were serious and complete enough for the court to appoint separate counsel, who would be charged with examining the record and the evidence that defendant claimed had not been proffered at trial, in order to determine whether there were grounds for filing a motion for new trial on the basis of ineffective assistance of counsel.

A further hearing on defendant's claims concerning trial counsel was conducted on November 9, 1994, and defendant again was given an opportunity to air his complaints concerning counsel's asserted omissions. The court appointed Attorney John Lippsmeyer to assist defendant in *evaluating*

whether a motion for new trial should be filed. In the meantime, the jury returned its verdict of death.

On December 2, 1994, the court asked Lippsmeyer to make a preliminary estimate of how long it would take him to determine whether a motion for new trial should be made. Lippsmeyer estimated the task would take four to six months. The matter was set for further hearing on December 9, 1994, when defendant made a motion to relieve King, the attorney responsible for presenting the defense at the penalty phase of the trial. At a further closed hearing, defendant explained his specific concerns with counsel, who was required to respond. The court denied the motion to relieve penalty phase counsel.

At a final hearing held on December 12, 1994, the court explained it had requested that Lippsmeyer determine whether a motion for new trial should be filed and what "time and resources" such a motion would consume. Lippsmeyer reported to the court that it would take a substantial period of time, probably at least six months, for him to be prepared for a hearing on a motion for new trial. The court agreed with Lippsmeyer's estimate, observing that the issue "would take a considerable time to review and a massive amount of documentation would have to be evaluated and presented to the [c]ourt." The court concluded that, under the circumstances, it was not possible to decide the ineffective-assistance-of-counsel claim expeditiously in a motion for new trial, explaining that "[t]he issues could only be resolved by a presentation and evaluation of the evidence that would be made in the equivalent of a habeas corpus review." The court further concluded that "the only practical approach" would be by way of "post trial habeas corpus review based on the claim that counsel performed inadequately *in matters that occurred outside the courtroom.*" (Italics added.) The court announced it would deny the motion for substitution of counsel, deeming defendant's oral presentations in the closed court sessions to be a petition for writ of habeas corpus and assigning the matter a separate superior court number for the purpose of further proceedings. The court directed that a written petition be filed within six months and also appointed counsel to represent defendant in the habeas corpus proceeding.

Contrary to the implication of defendant's argument in this court, the trial court did not conclude that a claim of ineffective assistance of counsel was not *cognizable* in a motion for new trial, nor did it refuse to consider a properly brought motion for new trial. Rather, our review of the record discloses that the court closely considered two of this court's relevant decisions, *People v. Fosselman, supra,* 33 Cal.3d 572, and *People v. Smith* (1993) 6 Cal.4th 684 [25 Cal.Rptr.2d 122, 863 P.2d 192], concluding

defendant's case was not an *appropriate* one in which to resolve the issue by way of such a motion. We conclude the trial court did not err in reaching this conclusion.

██ Our cases explain that, in appropriate circumstances, the trial court should consider a claim of ineffective assistance of counsel in a motion for new trial, because "*justice is expedited* when the issue of counsel's effectiveness can be resolved promptly at the trial level." (*People v. Smith, supra,* 6 Cal.4th at p. 695, italics added.) But our assumption has been that courts would decide such claims in the context of a motion for new trial when the court's own observation of the trial would supply a basis for the court to act expeditiously on the motion. As we stated in *People v. Fosselman, supra,* 33 Cal.3d 572: "It is undeniable that trial judges are particularly well suited to *observe courtroom performance* and to rule on the adequacy of counsel in criminal cases tried before them. [Citation.] Thus, in appropriate circumstances justice will be expedited by avoiding appellate review, or habeas corpus proceedings, in favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a motion for new trial. If the court is *able* to determine the effectiveness issue on such motion, it should do so." (*Id.,* at pp. 582–583, italics added.)

It is evident in the present case that, after lengthy deliberation, the trial court concluded justice would *not* be expedited by entertaining defendant's claim in a motion for new trial. The basis for this conclusion is readily apparent; the matter would have been delayed for at least six months while substitute counsel examined trial counsel's case records and performed additional investigation concerning witnesses who did not appear at trial and evidence that was not in the record, in order to decide whether to make a motion for new trial. This was *not* a case in which a motion readily could be resolved because of the circumstance that the trial judge was "particularly well suited to observe courtroom performance and to rule on the adequacy of counsel . . . ." (*People v. Fosselman, supra,* 33 Cal.3d at p. 582.) Rather, in the present case the claim of ineffective assistance of counsel at the guilt phase of trial rested primarily upon matters other than what the trial court could have observed during trial, and the court acted within its discretion in concluding the claim should be litigated in a habeas corpus proceeding.

Defendant objects that the court could have decided the merits of his claim because, by the time the court reached its conclusion, the penalty verdict had been entered and the jury discharged. He claims that any delay in the court's ruling on the automatic motion for reconsideration and in imposing sentence would not have posed any serious consequences, and observes that sentencing did not occur until several months after the trial court had ruled on the motion for new trial, further diminishing the significance of the delay anticipated by the court and by Lippsmeyer.

We remain unpersuaded that the court erred. It reasonably concluded that the volume of out-of-court material upon which defendant based his claim simply removed the case from the category of trials in which justice would be expedited by appointing substitute counsel to prepare a motion for new trial that raised an ineffective-assistance-of-counsel claim.

Defendant contends that an assertedly arbitrary violation of his state law right to consideration of this claim in the context of a motion for new trial constituted a violation of his federal constitutional due process rights, citing *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227]. Defendant's claim fails at the outset, because we have concluded he has not demonstrated a violation of state law. We also note that defendant has not attempted to explain why the trial court's decision not to undertake what essentially would have been a habeas corpus hearing has prejudiced him, considering the circumstance that defendant's right to obtain consideration of his claim of ineffective assistance of counsel by way of a petition for writ of habeas corpus has not been abridged.[14] Finally, we note that defendant has not attempted to argue or cite any support in the appellate record for his claim that he would have or should have prevailed on this ground in a motion for new trial.

### III. Penalty Phase Claims

Defendant's contentions concerning the penalty phase principally are limited to attacks on aspects of the California death penalty law that we have found unpersuasive in many past cases. Having rejected the same claims in prior cases, we see no reason to reconsider them.

Specifically, "[t]he statute (§ 190.2) does not impose overbroad death eligibility, either because of the sheer number and scope of special circumstances which define a capital murder, or because the statute permits capital exposure for an unintentional felony murder." (*People v. Anderson* (2001) 25 Cal.4th 543, 601 [106 Cal.Rptr.2d 575, 22 P.3d 347]; see also *People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568].) Our interpretation of the lying-in-wait special circumstance does not change this conclusion. (*People v. Crittenden, supra,* 9 Cal.4th 83 at pp. 155–156.) The state death penalty scheme meets Eighth Amendment requirements through its listing of special circumstances; the aggravating and mitigating circumstances referred to in section 190.3 do not and need not perform a narrowing function. (See *People v. Bacigalupo* (1993) 6 Cal.4th 457, 477 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

---

[14] Our review of the record has not disclosed whether the habeas corpus matter proceeded to judgment in the superior court.

█ The giving of CALJIC No. 8.85, the pattern instruction concerning the factors in aggravation and mitigation to be considered by the jury in imposing penalty, did not violate defendant's state and federal constitutional rights under the Eighth Amendment or state and federal constitutional guaranties of due process of law or equal protection of the laws. We have rejected the claim that the instruction is unconstitutionally vague. (*People v. Anderson, supra,* 25 Cal.4th at p. 600.) The court need not instruct sua sponte on the issue of "double counting." (*People v. Lewis* (2001) 25 Cal.4th 610, 669 [106 Cal.Rptr.2d 629, 22 P.3d 392].) There was no misleading prosecutorial argument on this point, and defendant does not claim otherwise. (See *ibid.*)

Instruction pursuant to CALJIC No. 8.88, another pattern instruction concerning the weighing of aggravating and mitigating circumstances, did not deprive defendant of rights under the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution or parallel state constitutional provisions. Defendant claims the instruction is vague and is biased in favor of a death judgment, fails adequately to define circumstances in mitigation or to describe the process of weighing the circumstances in aggravation and mitigation, "and deprived defendant of the individualized consideration the Eighth Amendment requires." He claims that the instruction would permit imposition of the death penalty "whenever aggravating circumstances were merely 'of substance' or 'considerable,' even if they were outweighed by mitigating circumstances," and that the instruction "improperly reduced the prosecution's burden of proof."

█ Defendant concedes that his claims have been rejected in past decisions, which we decline to reconsider. (*People v. Boyette* (2002) 29 Cal.4th 381, 464–467 [127 Cal.Rptr.2d 544, 58 P.3d 391].) In addition, we reject defendant's claim that the instruction misleads the jury by failing to supply a definition of life imprisonment without the possibility of parole. (See *People v. Arias, supra,* 13 Cal.4th at p. 172; see also *People v. Hawthorne, supra,* 4 Cal.4th at pp. 75–76.) Nothing in *Kelly v. South Carolina* (2002) 534 U.S. 246 [151 L.Ed.2d 670, 122 S.Ct. 726], or *Shafer v. South Carolina* (2001) 532 U.S. 36 [149 L.Ed.2d 178, 121 S.Ct. 1263], suggests the pattern instruction is inadequate; in those cases the jury was not instructed that a life sentence *was* without the possibility of parole, whereas the instruction under review did so inform the jury. (*People v. Martinez* (2003) 31 Cal.4th 673, 699 [3 Cal.Rptr.3d 648, 74 P.3d 748].)

█ Contrary to defendant's contention, "[t]he death penalty is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circum-stances over mitigating circumstances, or the appropriateness of a death

sentence." (*People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244].) Nor, contrary to defendant's claim, do the high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], or *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], alter this conclusion, either with respect to the existence of an aggravating factor or, as defendant contends in his supplemental brief, as to the determination whether aggravating factors outweigh mitigating factors. (*People v. Morrison, supra,* 34 Cal.4th at p. 730; *People v. Anderson, supra,* 25 Cal.4th at p. 590, fn. 14 ["death *is* no more than the prescribed statutory maximum for the offense . . . . Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi*"]; see also *People v. Monterroso* (2004) 34 Cal.4th 743, 796 [22 Cal.Rptr.3d 1, 101 P.3d 956]; *People v. Griffin, supra,* 33 Cal.4th at p. 595.) Nor do we find any basis for defendant's claim that if his other contentions fail, the jury still must be instructed on the *absence* of a burden of proof. (See *People v. Turner, supra,* 34 Cal.4th at p. 439 ["The jury need not be instructed on the burden of proof during the penalty phase because the sentencing function is 'not susceptible to a burden-of-proof quantification' "].)

Defendant asserts the imposition of a death sentence in his case violates the state and federal constitutional ban on cruel and unusual punishment, claiming the sentence is not a "constitutionally proportionate punishment for a homicide that occurs in the course of a robbery and which is unattended by the sort of heinous aggravating circumstances that one associates with death penalty cases. The circumstances of defendant's life, including his upbringing, his military service and the mental illness that affects him, show he is not the sort of depraved killer for which the death penalty is theoretically reserved."

Examining the nature of the crime in the abstract, the circumstances of the particular offense, and the character of the defendant (see *People v. Dillon* (1983) 34 Cal.3d 441, 479 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921]), we are not persuaded that the death penalty is "grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*People v. Dillon, supra,* 34 Cal.3d at p. 479.) The penalty is not disproportionate to defendant's "personal responsibility and moral guilt." (*People v. Marshall* (1990) 50 Cal.3d 907, 938 [269 Cal.Rptr. 269, 790 P.2d 676].) Defendant was 37 years of age at the time of the capital murder and had an extensive record of prior armed

robberies similar to the robbery in the present case, and the capital offense occurred within a year of his release from prison for robbery convictions, demonstrating a marked lack of rehabilitation. Defendant shot the murder victim at point-blank range to halt the victim's resistance to the robbery. Mitigating factors included diagnosed bipolar disorder, but defendant apparently refused to resolve his disorder by means of the medication that was prescribed for him. Defendant's childhood was relatively benign, and he was able to find employment as an adult, first through military service and then in various civilian placements. He denied that financial need motivated his prior robberies, but stated he enjoyed the excitement of the crimes. We are unable to conclude the punishment imposed is "grossly disproportionate to [his] individual culpability." (*People v. Dillon, supra,* 34 Cal.3d at p. 479.)

Defendant contends that multiple errors allegedly committed at the guilt phase undermined the reliability of the penalty phase of the trial. We have rejected the claim that the cumulative effect of error at the guilt phase was prejudicial at that stage of the proceedings, and defendant fails to persuade us that the same asserted error was prejudicial at the penalty phase.

 Contrary to defendant's claim, written findings concerning the aggravating factors used as a basis for imposing a death sentence are not constitutionally required. (*People v. Prieto* (2003) 30 Cal.4th 226, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Boyette, supra,* 29 Cal.4th at p. 466.) Intercase proportionality review is not required by the federal Constitution, and we decline to reconsider our prior relevant holdings on this issue. (*People v. Prieto, supra,* 30 Cal.4th at p. 276; *People v. Weaver* (2001) 26 Cal.4th 876, 992 [111 Cal.Rptr.2d 2, 29 P.3d 103].) Our state's death penalty law is not constitutionally flawed because of the assertedly excessive charging discretion afforded to prosecutors. (*People v. Boyette, supra,* 29 Cal.4th at p. 467; *People v. Weaver, supra,* 26 Cal.4th at p. 992.)

 Defendant contends the methods of execution employed in California violate the federal Constitution. First, he claims that his due process rights have been or will be denied, and his execution should not be carried out, because "the state has failed to comply with the statutory requirement that standards for lethal injection be established by the Department of Corrections." Second, he claims the death judgment should be vacated and the sentence should not be carried out because "both of the statutory methods of execution constitute cruel and unusual punishment in violation of defendant's rights under the Eighth Amendment." As this court repeatedly has recognized,

however, such claims are not cognizable on direct appeal, because "an imperfection in the method of execution does not affect the validity of the judgment and is not a basis for reversal of the judgment on appeal." (*People v. Holt* (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213]; see also *People v. Young, supra,* 34 Cal.4th at p. 1234; *People v. Samayoa* (1997) 15 Cal.4th 795, 864 [64 Cal.Rptr.2d 400, 938 P.2d 2]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1059 [60 Cal.Rptr.2d 225, 929 P.2d 544].) On direct appeal, defendant is restricted to claims "bear[ing] on the validity of the death sentence itself." (*People v. Snow* (2003) 30 Cal.4th 43, 128 [132 Cal.Rptr.2d 271, 65 P.3d 749].) His claim regarding the existence or nonexistence of regulations that may or may not be in effect when the judgment is to be carried out does not affect the validity of the death sentence. In essence, defendant's claim is premature. (*Ibid.*)

■ Defendant contends that "the violations of state and federal law articulated above also violate international law and the judgment must be set aside." This claim is not convincing, first because defendant has not established the premise for his argument that "violations of state and federal law" occurred during his trial. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1055 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) To the extent defendant alleges violations of the International Covenant on Civil and Political Rights, which he alleges incorporates the Universal Declaration of Human Rights, his claim lacks merit, even assuming he has standing to invoke this covenant. (*People v. Turner, supra,* 34 Cal.4th at pp. 439–440; *People v. Brown, supra,* 33 Cal.4th at p. 404 [" 'International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements' "].)

Contrary to defendant's claims, there were no errors at the penalty phase of his trial whose cumulative effect was prejudicial.

In his supplemental brief, defendant asserts that he was constitutionally entitled to separate guilt and penalty phase juries in order to ensure his right to an impartial jury, and that the trial court therefore erred in denying his motion for separate juries. He does not point to any particular circumstances unique to his case that rendered trial by a single jury unfair or that demonstrated good cause for empanelling separate juries, and he fails to persuade us to reconsider our decisions holding that the statutory preference for trial by a single jury is consistent with constitutional principles. (See § 190.4, subd. (c); *People v. Catlin, supra,* 26 Cal.4th at p. 114; *People v. Ray, supra,* 13 Cal.4th at pp. 357–358.)

IV. DISPOSITION

The judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.