Filed 11/19/14  P. v. Payne CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>GEORGE ALEXANDER PAYNE III,<br><br>　　　　Defendant and Appellant. | C069583<br><br>(Super. Ct. No. SF113417A) |

Following a jury trial, defendant George Alexander Payne III was convicted of torture (Pen. Code, § 206),[1] aggravated mayhem (§ 205), infliction of corporal injury to a cohabitant or fellow parent of a child (§ 273.5, subd. (a)), assault with a deadly weapon (§ 245, subd. (a)(1)), false imprisonment by violence (§ 236), misdemeanor battery on a spouse (§ 243, subd. (e)), and criminal threats (§ 422), with enhancements for great

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

1

bodily injury (§ 12022.7, subd. (e)).  The trial court sentenced defendant to 14 years to life plus three years.

On appeal, defendant contends the prosecutor's cross-examination of him violated *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] (*Doyle*).

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution's Case

S.B. is the mother of defendant's two sons, G.P. and J.P.  Her daughter K.B. was four and one-half years old when S.B. and defendant began their 12-year relationship. S.B. moved in with defendant in 1997.  After one and one-half to two years, the relationship became emotionally abusive.  They also used methamphetamine together.

In 1999, defendant held a knife to S.B.'s neck while they were in bed.  Defendant pulled a knife on her in a similar manner on two or three other occasions.

Defendant disciplined K.B. by making her stand in the corner for hours to an entire day or night.  S.B. was afraid to prevent defendant from punishing K.B.  Defendant also inflicted similar punishment on S.B., making her stand in the corner on numerous occasions.  He would also make S.B. sit in the corner to sleep, and would call her demeaning epithets when he was particularly angry.  If S.B. got angry, defendant became more verbally abusive and would push her against a wall.

S.B. went to a women's shelter in September 2003 because defendant punished her with sleep deprivation.  She took G.B., who was then an infant, with her.  After her first evening there, defendant called and told her not to stay more than 24 hours or the police would be notified.  Defendant told S.B. he found her location from an associate and would always be able to find her.

Defendant picked up S.B. from the shelter.  He immediately punched her in the nose, giving her a bloody nose.  He told S.B., " 'I'll show you why women go to a shelter,' " and " '[n]ow you know how it feels to have your son taken away.' "  He then

2

drove out to the Delta towards the river. While defendant drove, he told S.B. she should not have taken his son and she would regret doing so. Once at the river, defendant told S.B., " 'This is where you have to say goodbye to your son' " and told her to get out of the car. Defendant then pointed a gun at the back of S.B.'s head, and told her to say goodbye to her son. Defendant made S.B. take off her clothes; he then took out a blanket, pulled down his pants, told S.B. to beg for his forgiveness, and made her perform oral sex on him. Eventually, defendant told S.B. that was enough, told her to get dressed and get back into the car, and then drove S.B. and their son home. S.B. waited about a week to call the police because she thought defendant would kill her. Thereafter, defendant threatened her constantly, saying such things as he was thinking of a way to torture her and that she would die a terrible death.

The relationship improved when they lived with defendant's mother for two years. However, defendant would quietly threaten S.B. at night when no one was present.

The next major incident occurred on March 20, 2009, when S.B. came home late from work. Defendant was angry, and he pushed a frightened S.B. against a wall while pushing a metal bar capped at both ends against her throat. S.B. testified that she eventually left home and went to a local bar, where she met a man, went to his home, and had sex with him. The man dropped her off at her father's house, where defendant picked her up. On cross-examination, S.B. said she met two men and had sex with both of them.

S.B. told defendant about the sexual encounter while he drove her home. Defendant yelled at her, hit her several times, told her to take her clothes off, and threw the clothes out the window. Upon arriving at home, defendant made S.B. stay in the garage while he sent the children to the park. He then took S.B. to the bedroom and made her stand in the corner. Saying she did not deserve to be a mother and lost her right to be a mother, defendant hit her two or three times on the buttocks with the capped metal bar. He also "chopped [] off" S.B.'s hair with a pair of scissors, saying her hair contained

3

bad chemicals from drugs and she did not deserve to be treated like a human anymore. Defendant then shoved S.B.'s nose against a corner. He then took her to the bathroom shower and told her she had germs on her from the house where she had the affair and to take a shower. He then urinated on her. He turned on the water and made her take a cold shower, saying that she did not deserve to have hot water. Defendant next forced her into the bedroom without allowing her to dry off, made her stand in the corner, and then hit her with the metal bar. She lost count how many times she was struck, but may have told the police she was hit "thirty or so" times. He then made her stand in the corner all day, telling the children their mother was not feeling well.

Defendant apologized the following Sunday, and their relationship improved for awhile. S.B. was forced to stay in the bedroom during this time; she could take meals in the kitchen but was not allowed to talk to the children. When she tried to leave the room at the end of April 2009, defendant hit her lower leg with the metal bar, causing her to fall. When S.B. said she could not get up, defendant said he would hit her if she did not get up, and laughed as she struggled. He then hit her about 30 times.

Some time after Memorial Day, defendant told S.B. he was done being nice with her because she did not tell him everything about the affair. He would then make her stand in the corner for 16 to 18 hours a day. Defendant allowed her to eat only twice a day. By the middle of June, she was limited to one daily meal.

During the week of June 12-19, 2009, defendant made S.B. stand in the corner for 17 hours at a time, causing her legs to go numb. He also hit her with the metal bar 50 to 100 times during the week, putting her clothes in her mouth to muffle the screams. Defendant also withheld drugs from S.B., saying he was waiting for her to pass out so he could hit her in the head and bury her body in the backyard. He tied and gagged her with duct tape, and burned her with a hot methamphetamine pipe. Defendant burned her with the methamphetamine pipe at least six times, and would then beat her burns with the metal bar.

4

On June 19, 2009, S.B. left and drove to Reno, Nevada. She spent two nights in a women's shelter and three days in a hospital. When defendant called and said they had to appear at a dependency hearing, she returned home.

S.B. was treated at St. Mary's Hospital in Reno on June 23, 2009. She had multiple second degree burns and bruises of various ages, and appeared to have been injured over multiple events. Her legs were extremely swollen, which could have resulted from prolonged standing. She had lost a lot of blood and required a transfusion. S.B. gave inconsistent descriptions of how she sustained her injuries.

According to K.B., who was 19 years old by the time of her testimony, defendant would make her stand in the corner for up to an hour. S.B. stayed in her room for a three-month period starting around March 2009, coming out only to go to the bathroom and sometimes to eat. She would hear her mother scream in the bedroom every night during that time period. S.B.'s legs, thigh, arm, and face looked a "little" bruised. K.B. did not ask S.B. why she was spending so much time in the room because she did not want to get involved.

A search of the family's home found a methamphetamine pipe and a two-foot long metal bar capped at both ends. The officer saw red spots on the bedroom wall which might have been blood. The metal bar also looked like it might have blood on it.

**Defense Case**

Defendant testified. He denied ever holding a knife to S.B.'s throat. He had not abused her before she went to the shelter in 2003. He thought she was going to a drug-treatment program. Defendant went to the shelter to meet her. As he started to drive away, S.B. yelled for him to stop. Defendant stopped, and she punched him in the nose before getting into the car. Defendant did not hit her. He never made K.B. stand in the corner all day.

5

S.B. eventually took over the family finances. Their relationship deteriorated because she lied about their finances. Defendant found a white powder in S.B.'s possession at this time, and noticed she was acting differently.

They decided to separate and to wind down their relationship by the end of the school year in 2009. In March 2009, defendant called S.B. at work after discovering that their savings was gone. When S.B. arrived home at 6:30 p.m. the next day, defendant was dumping her drugs and alcohol in the bathroom. S.B. pushed defendant and said the drugs were a friend's. Defendant did not push the metal bar to her throat.

Defendant told S.B. to leave after smelling alcohol on her breath. She took the car keys, so defendant grabbed them because she was drunk. S.B. then hit defendant with the bar while he was cleaning the bathroom. Defendant fell down. He then pushed S.B. out of the bathroom, went to the bedroom, and sat on the bed. S.B. jumped on defendant and hit him with the metal bar. As they grappled for the bar, defendant struck her on the ankle with it. S.B. left and went to her father's house.

Defendant testified he did not take drugs or abuse S.B. during this period. He never hit her with the bar, did not make her stand in the corner, and never withheld food. He did see groups of people having sex in the house.

Defendant also testified that S.B. showed him a video of her masturbating with the bar. The video also showed her hitting herself with the bar, as well as a pool cue, a dildo, and a pink strap. She told defendant that she hit herself, and that other people had hit her at parties.

## DISCUSSION

Defendant's sole contention is that the prosecutor's cross examination of him concerning S.B.'s alleged videos violated *Doyle v. Ohio*, *supra*, 426 U.S. 610. We disagree.

6

## A.  Background

During the prosecutor's cross-examination of defendant about the videos, the following took place:

"[PROSECUTOR]:  Do you have any of these videos?

[¶]…[¶]

"[DEFENDANT]:  For a while there was -- I found some.  I didn't keep them.  I thought she took them all.  I found them in some of the other videos of our family events.

"[PROSECUTOR]:  And you kept them.  Do you have them with you?

"[DEFENDANT]:  No, ma'am.

[PROSECUTOR]:  Why not?

"[DEFENDANT]:  Don't know where they were.  She said -- [S.B.] told me she went and took them.  Good luck using them in court.

"[PROSECUTOR]:  You said you found a couple of them.  When did you find them?

"[DEFENDANT]:  In the fall of 2009.

[¶]…[¶]

"[PROSECUTOR]:  You had already been charged in this case, correct?

"[DEFENDANT]:  I don't think you charged me with this by then, did you?

"[PROSECUTOR]:  Did police come and talk to you in June of 2009?

"[DEFENDANT]:  Yes, ma'am.

"[PROSECUTOR]:  Okay. Did you tell the police you got these tapes that you're now testifying to?

"[DEFENDANT]:  No."

At this point, defense counsel objected and asked to approach the bench.  The trial court then called the morning recess.  During the recess, defense counsel told the trial court that defendant invoked his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] when he was arrested in July 2009.  Counsel argued, "It is completely

7

improper for the prosecutor to go into this matter when she knows his *Miranda* rights have been invoked. I think it's bordering very close to a mistrial that may have to be sought in this matter if she continues on this line of questioning." The prosecutor responded, "I didn't want to go into this line of questioning. Actually, the defendant opened it up by saying, hey, there's these videos I see. The victim, [S.B.], says she has these videos. Good luck using it in court. It was reasonable to follow up to say wait a minute, you're testifying to things that existed that supposedly go towards your innocence, 'cause she's beating herself and you don't have them or haven't told anybody why."

The trial court sustained the objection, finding questions concerning defendant's post-*Miranda* failure to tell the police about the videos were improper.[2] The court indicated it would admonish the jury to disregard the last two questions and answers without repeating the specific questions and answers. Following unrelated discussions with the attorneys and defendant, the trial court recalled the jury and gave the following instruction: "[W]ith respect to the last two questions, ladies and gentlemen, the objection is sustained. I would ask and order you to disregard the last two questions, last two responses. [¶] And it is ordered that those questions and responses be stricken from the record." The prosecution's cross-examination of defendant then resumed.

A short time later, the prosecutor returned to questions about the videotapes.

"[PROSECUTOR]: And now, you said that you found some of these tapes in fall, which would have been September, October time of 2009. Do you still have them?

---

[2] Even after the trial court sustained the objection, the prosecutor persisted, stating that she wanted to ask defendant about some letters about which he had testified and whether he had turned those over to the police. After the trial court further explained its ruling by reading a passage from one of the cases it had researched during the break, the prosecutor asked, "Would the Court -- after lunch if I could do some legal research. If I can find cases, would the Court be willing to at least review the ruling?" The trial court said it would, but the prosecutor never returned to the subject.

"[DEFENDANT]:  No.

"[PROSECUTOR]:  Where are they?

"[DEFENSE COUNSEL]:  Objection.  Based on the court's prior ruling."

After a bench conference, the trial court sustained the objection on the grounds that the question had been asked and answered.[3]

## B.  Analysis

It is a fundamental, well-settled rule that the prosecution's use at trial of a defendant's silence following *Miranda* warnings violates due process.  (*Doyle*, *supra*, 426 U.S. at p. 619.)  The *Doyle* rule is premised on the recognition that it is fundamentally unfair to " 'permit the prosecution during the trial to call attention to [the defendant's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony….' " (*Ibid*.)

Defendant argues the prosecutor's questions violated *Doyle* by impeaching him with his silence after he invoked *Miranda*.  He claims the trial court's admonition did not cure the error due to the lapse of time between the cross-examination and the admonition and because the trial court did not reference the specific questions and answers it had stricken in the admonition.  He also complains that the warning did not inform the jury it should not infer defendant "improperly exercised his right to silence when he was talking to the police."

---

[3]  Neither the bench conference nor a summary thereof is in the record before us. However, we note that defense counsel had earlier indicated that the prosecutor's questions violated the attorney-client privilege in addition to making the *Doyle* objection. The trial court did not address that the attorney-client privilege objection on the record, finding only that there had been a *Doyle* violation.  Defendant does not make a claim of attorney-client privilege in this appeal.

In *Greer v. Miller* (1987) 483 U.S. 756 [97 L.Ed.2d 618] (*Greer*), the defendant testified he had taken no part in a kidnapping, robbery, and murder, but the perpetrators had admitted their crime to him. (*Id.* at p. 758.) On cross-examination, the prosecutor asked: "Why didn't you tell this story to anybody when you got arrested?" (*Id.* at p. 759.) Before defendant answered, the trial court sustained defense counsel's objection and told the jury to ignore the question. (*Ibid.*)

On review, the Supreme Court concluded there was no *Doyle* violation. The high court reasoned, "the trial court in this case did not permit the inquiry that *Doyle* forbids. Instead, the court explicitly sustained an objection to the only question that touched upon Miller's postarrest silence. No further questioning or argument with respect to Miller's silence occurred, and the court specifically advised the jury that it should disregard any questions to which an objection was sustained. Unlike the prosecutor in *Doyle*, the prosecutor in this case was not 'allowed to undertake impeachment on,' or 'permit[ted]… to call attention to,' Miller's silence. [Citation.] The fact of Miller's postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference, and thus no *Doyle* violation occurred in this case." (*Greer v. Miller*, *supra*, 483 U.S. at pp. 764-765, fns. omitted.)

In *People v. Clark* (2011) 52 Cal.4th 856 (*Clark*), our high court discussed *Doyle* and *Greer*. In *Clark*, the prosecutor elicited evidence from an investigating officer that the defendant invoked his *Miranda* rights and was thereafter informed he was under arrest for murder and attempted murder. The prosecutor then asked whether there was a change in the defendant's demeanor after being advised of the charges. The officer testified that the defendant showed no emotional reaction to being informed about the charges and did not inquire as to who he was accused of murdering. Thereafter, defense counsel moved for a mistrial contending the prosecutor had committed *Doyle* error. (*Clark*, *supra*, 52 Cal.4th at pp. 958-959.) The trial court later admonished the jury, " '[Y]ou may recall that Detective Souza had responded that…when [defendant] was

10

advised of the charges involved, not the name of the victims but the charges involved, there was no verbal…response by him, the inference being that maybe there should have been had you not already known, right?  [¶]  And I want to say to you that [the] evidence of no verbal response is…now stricken by the Court, and that any such inference such as the one I mentioned is not to be made.  In other words, his silence is appropriate at that point.' " (*Id*. at p. 959.)

Citing *Greer*, *supra*, 483 U.S. at pages 764-765, the *Clark* court wrote:  "The United States Supreme Court has explained that a *Doyle* violation does not occur unless the prosecutor is *permitted* to use a defendant's postarrest silence against him at trial, and *an objection and appropriate instruction to the jury ordinarily ensures that the defendant's silence will not be used for an impermissible purpose*.  [Citation.]  The trial court did not abuse its discretion when it determined that any potential prejudice from [the officer's] testimony would be cured by its prompt admonition to the jury to disregard the stricken evidence and the inferences adverse to defendant that could be drawn from it. The court thus did not err in denying defendant's motion for mistrial.  [Citation.]" (*Clark*, *supra*, 52 Cal.4th at p. 959, first italics in original, second italics added.)

Here, just as in *Greer* and *Clark*, the fact of defendant's postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference.  Any potential prejudice was cured by the trial court's instructions.  Thus, there was no *Doyle* violation.

Defendant asserts that because of the trial court's decision to not include the specific questions and answers it struck in the admonition and the time that went by during the recess, the jury may not have recalled the specific questions encompassed by the admonition.  While the passage of time may so attenuate an admonition as to render it ineffective, in our view, this is not such a case.  Only approximately 20 minutes elapsed between the beginning of the recess and the court's admonition.

Citing *Clark*, defendant contends that "the proper approach" would have been for the trial court "to inform the jury that it should disregard any inference that [defendant] improperly exercised his right to silence when he was talking to the police." However, unlike *Clark*, the jury here never heard that defendant invoked his right to remain silent. While the trial court's admonition in *Clark* was appropriate given the circumstances in that case, it would have been improper for the trial court here to suggest by such an admonition that defendant had invoked his right to remain silent.

Defendant also suggests that the prosecutor's later questions involving the time period after defendant had invoked *Miranda*, were improper and somehow made the admonition ineffective. However, the question about which defendant complains related to the whereabouts of video tapes defendant said he had found during that time period. This question did not implicate *Doyle*, because the question did not implicate his post-*Miranda* silence, but merely sought to determine the current location of the tapes about which defendant testified. It is well-settled that it is not inappropriate for the prosecutor to comment on the defense failure to introduce material evidence. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 [prosecutor's comment on the failure to call logical witnesses was not improper]; *People v. Cornwell* (2005) 37 Cal.4th 50, 90 ["the prosecutor may comment ' "on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses." ' "]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1340 [the prosecutor may comment on the lack of evidence, which might have been presented in the form of physical evidence].) And the trial court sustained the defense objection, not on *Doyle* grounds, but on the ground that the question had been earlier asked and answered.

We note that while the prosecutor commented on the failure to produce these tapes during her closing arguments, she did not mention defendant's failure to tell the police about the videotapes. Thus, like in *Greer*, the prosecutor here did not attempt to use defendant's silence against him during her argument.

We also note that the trial court's specific admonition curing the prosecutor's earlier *Doyle* error was reinforced when it instructed on CALCRIM No. 222 as part of the final instructions to the jury.   Pursuant to that instruction, the trial court told the jury, "During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses.  I ruled on the objections according to the law.  If I sustained an objection, you must ignore the question.  If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did.  If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose."

We presume the jury followed these admonitions, and there is nothing in the record to rebut that presumption.  (*Greer*, *supra*, 483 U.S. at p. 766, fn. 8.)  As there was no *Doyle* error, we reject defendant's claim.

**DISPOSITION**

The judgment is affirmed.

                                                                          MURRAY                  , J.

We concur:

         HULL                    , Acting P. J.

         DUARTE            , J.

13